NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

LOCAL 825, INTERNATIONAL UNION
OF OPERATING ENGINEERS,
AFL–CIO, Respondent.

No. 14004.

United States Court of Appeals
Third Circuit.

Argued Dec. 4, 1962.

Decided March 28, 1963.

Hans J. Lehmann, Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Samuel M. Singer, Atty., N. L. R. B., on the brief), for petitioner.

Michael Breitkopf, Newark, N. J. (John J. Mooney, New York City, on the brief), for respondent.

Before BIGGS, Chief Judge, and STALEY, Circuit Judge, and LEAHY, District Judge.

LEAHY, District Judge.

This case is here upon the petition of the National Labor Relations Board under § 10(e) of the National Labor Relations Act, 29 U.S.C. § 151 et seq., for enforcement of its order directed at Local 825, International Union of Operating Engineers, AFL-CIO (referred to as the Union). The unfair labor practices are alleged to have occurred in Elizabeth, New Jersey. The question for decision is whether substantial evidence supports the Board's finding that the Union engaged in unlawful secondary activity under § 8(b) (4) (ii) (B) of the Act by refusing to refer employees to Ernst and Ochs (more particularly identified infra) [1] with the plan of forcing them to cease doing business with R. G. Maupai Co., Inc., in order to force Maupai to recognize and bargain with the Union.

By its fact-finding the Board concluded the Union had violated the Act by refusing to refer its members to a neutral employer—Ernst—when obligated by contract to do so and with the design to force the employer to cease doing business with Maupai and thus force Maupai to recognize and bargain with the Union. This is the master fact found by the Board.

It is difficult to give a succinct exposition to the Board's subsidiary findings of fact. As Trial Examiner Funke, for example, concluded: "Much of the testimony in this case is obscure, confused, contradictory and, on some vital issues, meagre to a point approaching absence. From such an olio, decision must nevertheless be reached." The narrative of what happened may be, of necessity, somewhat lengthy.

Maupai manufactures and installs heating, air conditioning, and plumbing products. Maupai was a member of the Mechanical Contractors Association which had a collective labor agreement with the Pipefitters' Union [2] and, under the agreement, hired as its employees members of that union. In June 1959, Maupai contracted with the Housing Authority of the City of Elizabeth, New Jersey, to install a heating system in an apartment house. In April 1960, as part of its operations it used a gasoline driven electric welding machine operated by a welder who was a member of the Pipefitters. The Union's shop steward, Hayes, directed Maupai's foreman, Lakin, to hire and assign an operating engineer for the welding machine. Lakin said he already had a pipefitter operating the machine. Later the Union's business agent, Pierson, phoned Maupai and likewise stated an engineer should be on the machine.

Maupai had a subcontract with Ernst for the excavating work covering the digging of a hole for the installation of a 15,000 gallon fuel tank in the heating plant. Ernst rented a crane, in connection with the excavating work, from Ochs. Ernst, shortly before this, signed a contract and forwarded it to the Union under which it was provided "whenever desiring to employ workmen * * * employer shall call upon the Union * * for any such workmen as the employer may, from time to time, need and the Union * * * shall refer such workmen from the open employment list." On July 6, 1960, Ochs' crane was delivered to the job site with Zahn the operator and an oiler; but the crane was not operated that day because the oiler had not paid his dues with Local 825. The next day the crane was operated by Zahn and another oiler, Williams, both of whom had been referred to the job by the Union. But on the next day a work stoppage occurred—Zahn did not show up for work, and Williams and Esposito, both Union members, refused to work. Ernst was there at the time. He asked Corrigan, a Union member and a master mechanic for another contractor on the project, for an explanation. Corrigan said the men did not want to work be-

1. It was agreed at oral argument that due to the meager evidence relating to Ochs, he should assume no role in this litigation.

2. United Association of Pipefitters and Apprentices, Local 475.

cause there was no labor agreement between the Union and Maupai. Ernst asked two other workmen if this were true and they said it was. Maupai's president came to the job site. He was told Esposito and Williams would not work because his company had no agreement with the Union. Maupai said he would not recognize the Union; then Williams said "he would not recognize Maupai." Ernst communicated with the Union's hiring hall, but was unable to get any other workmen. He then phoned Pierson, the Union's business agent, repeated the request for workmen, but Pierson refused to refer anyone until Maupai signed a contract and renewed his demand that Maupai should employ an operating engineer on the welding machine. The next day Maupai asked Pierson on the phone why the work stoppage had occurred, and he was told the same story Pierson had told Ernst. Then on July 25, Pierson met with Maupai's representatives to see if the men would go back to work. Pierson said the men would return to work if Maupai would sign an agreement with the Union. Bargaining was resumed—e. g., whether the unfair labor practice charges would be withdrawn, whether the same dispute would ever arise again, etc. The meeting ended. No agreement was reached by the parties. Thereafter Ernst made further requests of the Union for men to work on the project. All requests were refused by the Union.

The Board was in agreement with the Trial Examiner that the Union did not start the work stoppage of Ernst's employees on July 8; since Maupai had no contract with the Union, they had ceased to work themselves because they were concerned about their pension and welfare funds. The Board dismissed the complaint and found no violation of § 8

(b) (4) (i) (B) of the Act; it did find, however, the Union, under its agreement, was bound to refer its members for employment to Ernst; it refused to do so; and that the object of the refusal was to force Ernst to cease doing business with Maupai so as to force Maupai to recognize and bargain with the Union. Such conduct, the Board found [contrary to the Trial Examiner] constituted a violation of the Act, § 8(b) (4) (ii) (B). The Board then ordered respondent to cease and desist and to post appropriate notices.

1. The relevant part of § 8 (b) (4), as amended by the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 158(b) (4) (ii) (B), clearly states it to be an unfair labor practice for a union or its agents:

"(ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where * * * an object thereof is—

"(B) forcing or requiring any person to cease * * * doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 9 * * *."

The statute in its present form deals with secondary boycotts and its provisions are not restricted to the use of force or violence as a means of bringing pressure against the secondary employer, but includes economic sanctions also.[3] N. L. R. B. v. Highway Truckdrivers and Helpers, Local No. 107, etc., 3 Cir., 300 F.2d 317. Thus, it is unlawful to "coerce a secondary employer * * * by deny-

---

3. S.Rep. No. 187 on Senate Bill S. 1555, pp. 58–59, I. Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, pp. 454–455 (hereafter referred to as "Leg.Hist."), U.S. Code Congressional and Administrative News 1959, p. 2318.

This Court made a complete examination of the pertinent legislative history in N. L. R. B. v. Highway Truckdrivers & Helpers, Local No. 107, 3 Cir., 300 F. 2d 317, 320–321, and concluded § 8(b) (4) (ii) (B) prohibits economic sanctions against a secondary employer.

ing him access to the craftsmen on the hiring hall list." [4] The language of the statute is without ambiguity and makes it unlawful to refuse to refer under a hiring hall arrangement, since such a refusal was one of the evils contemplated to be remedied by the 1959 amendments to the Act. In short, the Union's refusal to refer employees was a device to exert secondary pressure against Maupai and to this extent such refusal was unlawful.

■ 2. The Board found—we think correctly—that Maupai, the primary employer, was engaged in commerce under the Act, as was Ochs, from whom Ernst rented the crane needed for the excavation work to be done by Ernst, since both employers made substantial purchases of machinery and materials out of state. N. L. R. B. v. Plumbers Union of Nassau County, etc., 2 Cir., 299 F.2d 497, in a factually similar situation, held it not necessary for the Board to show that each contractor on a project be engaged in commerce, but sufficient to show "[T]hat a work stoppage by the building crafts on the job would substantially affect the flow of materials into the state for incorporation into the building under construction, and that consequently * * the general contractor was so engaged." (p. 500). And even though some of the subcontractors "may not have been shown to have been in commerce, a dispute stopping their work on the job is properly held to affect commerce," citing N. L. R. B. v. Denver Building & Construction Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284; International Brotherhood of Electrical Workers, etc. v. N. L. R. B., 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299; and Local 74, etc. v. N. L. R. B., 341 U.S. 707, 71 S.Ct. 966, 95 L.Ed. 1309.[5] As we have said before, "what affects the building industry in a given community affects interstate commerce," and while "[o]ne small stoppage may not have an immediately perceptible effect upon the flow of the whole stream * * * many small stoppages will have such effect." Shore, etc. v. Building & Construction Trades Council, 3 Cir., 173 F.2d 678, 8 A.L.R.2d 731.

There is substantial evidence to support the Board's finding that the refusal of the Union to furnish workers to Ernst brought about a stoppage of the excavation work. The July 25 meeting was held between Pierson, the Union's business agent, and Maupai's president, for the specific purpose of attempting to bring the men back to work, but with no such result. After the issuance of the District Court's temporary injunction,[6] the Union ordered Esposito back to work for Ernst. The record supports the Board's finding that the Union's refusal to furnish men resulted in a stoppage of work on the job site, and this clearly affected commerce under the authorities cited, supra.

■■ 3. The Union had a contractual duty to refer employees to Ernst which it violated. The Union through its business manager asked Ernst to sign the contract, which he did, and transmitted his signed copies through Corrigan to the Union. There never was any dispute between the Union and

---

4. II. Leg.Hist. 1581. For proposed amendments and debate on broadening the scope of the statute, see I. Leg.Hist. 475, 942; II. Leg.Hist. 975–976; 1194; 1198; 1523, 1581; I. Leg.Hist. 619, 681, 1700.

5. Cf. N. L. R. B. v. United Brotherhood of Carpenters & Joiners of America, etc., 6 Cir., 181 F.2d 126, 130, aff'd Local 74, etc. v. N. L. R. B., 341 U.S. 707, 71 S.Ct. 966, 95 L.Ed. 1309: "A secondary boycott against a contractor engaged solely in intrastate activities to compel it to cease doing business with [an employer] engaged primarily in interstate business constituted an unfair labor practice under section 8(b) (4) (A)." See, too, United Brotherhood of Carpenters, & Joiners of America, etc. v. Sperry, etc., 10 Cir., 170 F.2d 863, 868.

6. Cuneo v. Local 285, International Union of Operating Engineers, D.C.N.J., No. 653–60, where Judge Smith issued a temporary injunction which ordered the Union to refer prospective employees to Ernst. The entire testimony was incorporated into the record before the Board in the case at bar.

Ernst over the contract. The Union supplied men to Ernst before July 7, 1960. It sent him forms needed for making payments to the pension and welfare funds. That the Union failed to sign the agreement is immaterial for any written contract though signed only by one of the parties binds the other if he accepts it and both act in reliance on it as a valid contract.[7] Justice Holmes once said: "[C]onduct which imports acceptance is acceptance or assent, in the view of the law, whatever may have been the actual state of mind of the party."[8] And as Lord Chancellor Sugden wrote:[9] "Tell me what you have done under such a deed and I will tell you what the deed means." It is clear the Union violated its duty to refer employees to Ernst.

4. The Union's object, as the Board correctly found, was to cause a stoppage of work of the subcontractor with Maupai in order to force Maupai to enter into a contract with the Union. The record supports the Board's finding the Union wanted one of its members to operate Maupai's welding machine and to have a contract with Maupai covering the operation. In fact, the Union made such a demand; Pierson, the business agent, reiterated it several times; it was also admitted before the District Court. The record shows the Union's pressure on Ernst, a neutral employer, by shutting off his labor supply. In conclusion, we think the coercive action of the Union against Ernst for the purpose of obtaining recognition and bargaining rights from Maupai was in violation of § 8(b) (4) (ii) (B) of the Act; and there is substantial evidence to support the Board's findings and conclusions.

A form of decree should be submitted enforcing the order of the Board.

7. 1 Williston on Contracts, 3rd ed. § 90A; Corbin on Contracts, ¶ 75; Girard Life Insurance and Trust Co. v. Cooper, 162 U.S. 529, 543, 16 S.Ct. 879, 40 L.Ed. 1062; First National Bank of Sleepy Eye, Minn. v. Sleeper, 8 Cir., 12 F.2d 228; J.P.C. Petroleum Corp. v. Vulcan Steel Tank Corp., 10 Cir., 118 F.2d 713, 716.

See, too, Smith v. Onyx Oil & Chemical Co., 3 Cir., 218 F.2d 104, 108, 50 A.L.R. 2d 216.

8. Hobbs v. Massasoit Whip Co., 158 Mass. 194, 33 N.E. 495. See, too, Corbin, loc. cit. pp. 235-236.

9. 1 Drury & Warren (Ir.Rep.) 353, 368.