ROADWAY EXPRESS, INC., Appellant,

v.

GENERAL TEAMSTERS, CHAUF-
FEURS AND HELPERS UN-
ION, LOCAL 249.

No. 14342.

United States Court of Appeals
Third Circuit.

Argued Oct. 21, 1963.

Decided April 29, 1964.

Jack J. Rosenberg, Pittsburgh, Pa.
(Rosenberg & Lubow, Martin Lubow,
Pittsburgh, Pa., on the brief), for appel-
lant.

Ben Paul Jubelirer, Pittsburgh, Pa.,
for appellee.

Before BIGGS, Chief Judge, GANEY,
Circuit Judge, and NEALON, District
Judge.

GANEY, Circuit Judge.

Plaintiff brought an action under § 301
(a) of the National Labor Management

Relations Act, 29 U.S.C.A. § 185(a), for breach of an alleged labor agreement. The District Court granted defendant's motion to dismiss the action on the ground that there was no such agreement existing between the parties. Plaintiff appealed.

The complaint, filed October 16, 1961, avers: Plaintiff, Roadway Express, Inc., is a common carrier for hire and maintains a number of trucks and freight terminals in many areas throughout the United States, and is engaged in an industry affecting interstate commerce. Defendant, General Teamsters, Chauffeurs and Helpers Union, local 249, an affiliate of International Brotherhood of Teamsters, Chauffeurs and Helpers of America, is the bargaining agent for its members who work in the Western District of Pennsylvania. On or about June 1, 1961, Local 249 and Roadway entered into a collective bargaining agreement covering the wages, hours of work and other terms and conditions of employment for approximately 13 persons employed at Roadway's Pittsburgh, Pennsylvania terminal. By its terms this agreement became effective June 1, 1961, and is in full force and effect up to January 31, 1964. It provides that the parties to the agreement will not resort to strikes, lockouts, tie-ups or legal proceedings before using all possible means of settling any controversy that might arise. Despite this latter provision, at approximately 12:01 a. m. on August 1, 1961, members of Local 249 conducted a work stoppage at Roadway's Pittsburgh terminal in direct violation of the agreement without resorting to the grievance procedure set forth therein. By reason of the work stoppage and attendant picketing, Roadway was unable to operate its Pittsburgh terminal from August 9, 1961. The prayer for relief asks for damages from that date as a result of Local 249's action. Jurisdiction is based on § 301(a) of the Labor Management Relations Act, 29 U.S.C.A. § 185(a).

The answer filed by Local 249 alleged that a prior agreement between the parties expired May 31, 1961, that since then they had continued to negotiate a new agreement which has not been agreed upon or executed, and that Local 249 conducted a work stoppage because of Roadway's failure to reach a new agreement. The answer incorporated a motion to dismiss on the ground that the complaint failed to state a claim under § 301 of the Act upon which relief can be granted, because no collective bargaining agreement has existed between Local 249 and Roadway since May 31, 1961.

Neither party requested a trial by jury.

On December 15, 1961, the setting of a date for hearing argument on the motion to dismiss was continued until further order of the District Court. Thereafter, the oral depositions of the following persons were taken by Local 249: G. A. Leach, vice-president of Roadway; Daniel M. Gunn, assistant vice-president of Roadway and director of labor relations; William A. Shuey, district manager of Roadway; Richard F. Ackerman, manager of Roadway's Pittsburgh terminal; and James H. Hutchinson, Jr., business manager of the Western Pennsylvania Motor Carriers Association. Argument was heard on the motion to dismiss on November 15, 1962, before the 1963 amendment to Rule 56 of the Civil Rules of Federal Procedure became effective. At this argument, Local 249 presented the transcripts of the oral depositions of the five persons mentioned above along with 49 exhibits. No depositions or affidavits were filed on behalf of Roadway. The record does not reveal what transpired at the argument.

The District Court, attaching importance to the fact that the written agreement was not signed by Local 249 and that negotiations on disputed issues continued after June 15, 1961, without the parties reaching an accord, and also to its determination that the resumption of work on June 15 had no probative force with respect to the existence of a contract because of the principle of "No contract, no work" is not practiced in the freight transportation by motor vehicle industry, concluded "as a matter of law" that the

facts showed no contract existed. 211 F. Supp. 796 (W.D.Pa.1962).

■■■ Although the motion to dismiss was implicitly filed under Rule 12 (b) (6) of the Federal Rules of Civil Procedure, Roadway claims the District Court, in effect, treated the motion as having been made pursuant to Rule 56 for summary judgment, and that it erred in holding that as a matter of law no agreement existed between the parties. Rule 12(b) provides in part:

"If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."

Matters outside the pleadings were presented to and not excluded by the District Court. Clearly such matters were considered by that court as a basis for its opinion.[1] However, Local 249 argues that the opinion plainly indicates that the District Court considered the motion to dismiss as having been filed under Rule 12(b) (1) for lack of jurisdiction over the subject matter. It reminds us that Rule 12(d) requires the defenses enumerated under subdivision (b) shall be heard and determined before trial on application of any party, and in this case it did ask for such a hearing. In other words, Local 249's position is that the existence of a contract in an action brought pursuant to § 301 of the Act is a jurisdictional fact, the existence of which may be determined by a district court prior to trial.[2] We cannot agree. The complaint properly averred a cause of action under § 301 of the Act. Atkin-

son v. Sinclair Refining Co., 370 U.S. 238, 241, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962). Hence the District Court had jurisdiction over the claim. Whether such averments have merit or not is immaterial on the question of jurisdiction since that is determined from the face of the complaint. Hall v. Sperry Gyroscope Co., etc., 183 F.Supp. 891 (D.C.N.Y.1960).

However, we will not infer that the ground for granting the motion was lack of jurisdiction over the subject matter, but will treat the Court's order as having been made pursuant to Rule 56.

In Bragen v. Hudson County News Company, Inc., 3 Cir., 278 F.2d 615, 617, this court set forth some of the well-settled principles applicable to summary judgment proceedings. One of the authorities cited in that case is Krieger v. Ownership Corporation, 270 F.2d 265, at page 270 (C.A.3, 1959), which states: "Documents filed in support of a motion for summary judgment are to be used to determine whether issues of fact exist *and not* to decide the fact issues themselves. * * *" Applying those principles we must determine whether there is a genuine issue as to any material fact.

For the three year period beginning June 1, 1958, and ending with May 31, 1961, there was in existence a "City Freight Agreement" between the Western Pennsylvania Motor Carriers Association ("Association") and the Eastern Conference of Teamsters, Teamsters Joint Council No. 40, freight division, the collective bargaining agent for thirteen local unions that were affiliated with the International Teamsters Union. The Association represented approximately 120 motor carriers operating in the Pittsburgh area. Roadway was a member of the Association until February 10, 1961. Roadway assigned as its reason for resigning from the Association a provision in the Association's by-laws requiring its members to accept the terms and

1. In its opinion the Court states: "From depositions and statements of counsel at the argument the facts regarding the dealings of the parties are clear and un-

contradicted." 211 F.Supp. 796 (W.D. Pa.1962).

2. See 5 Moore's Fed.Practice (2d Ed.) ¶ 38.36.

conditions of a contract negotiated between the Association and the unions without giving the members the opportunity to raise objections to such terms and conditions if they were not acceptable to them.

On May 5, 1961, Local 249 mailed to Roadway a proposed "Local Cartage Agreement" covering the period June 1, 1961 through January 31, 1964. The proposed agreement provides that the employer recognized that Joint Council No. 40 and Local 249 are exclusive representatives of all employees in the classification of work covered by the agreement. The cover page shows the following notation: "In submitting this proposal the Local Unions reserve the right to bring up for negotiation any matter related to wages and conditions of employment, whether or not it is contained therein." After May 5, a series of meetings were held by Joint Council No. 40, acting on behalf of the local affiliated unions, and the independent motor carriers of which Roadway was one, looking forward to the formation of a contract.

At approximately 10:45 p. m. on May 31, 1961, an hour and a quarter prior to the expiration of the old contract, Local 249 called a work stoppage at Roadway's Pittsburgh terminal. On June 1, 1961, Joint Counsel No. 40 submitted to Roadway and the other independents specific changes in the proposed agreement and advised them that it and the Association had agreed upon the changes. A formal agreement incorporating these changes was entered into between Joint Counsel No. 40 and the Association on the same day. Roadway did not indicate assent to the proposed agreement and amendments at that time. At the meeting Roadway learned from Thomas L. Fagan, president of Local 249, that the reason for the work stoppage was that a memorandum of understanding in connection with the new agreement had not been agreed upon and that Local 249 would not conclude any agreement until certain outstanding grievances between the parties were resolved. A further meeting was held on the same day in an effort to adjust the grievances. These negotiations were unsuccessful. Nevertheless, at 7:07 p. m. of the same day, Roadway sent the following telegram to Local 249:

"This is notice that Roadway Express, Inc., Pittsburgh, Pennsylvania, accepts the terms of the new labor contract as negotiated by the Western Pennsylvania Carriers Association to become effective June 1, 1961."

Despite this telegram the work stoppage continued. Thereafter several meetings were held relative to the work stoppage. The depositions are not clear when and where they were held and what transpired at those meetings. On the morning of June 15, 1961, a meeting was held at the Roadway Terminal in Pittsburgh. According to the depositions all of the outstanding grievances were adjusted, a tentative agreement was reached on the procedure for determining when a helper should be used in picking up or in dispatching a load, the parties agreed upon the terms of the written agreement, and the employees went back to work under the conditions of that agreement even though there was no exchange of signed contracts. Thereafter meetings were held by Roadway and Local 249 to work out a procedure for settling differences between them when Roadway disagreed with a driver's request for a helper on a particular load. The problem of who should make the decision and who should be required to file a grievance, the local union or the employer, in the event of a disagreement as to which loads helpers should be assigned was the main cause of friction between the parties.

On August 8, 1961, one of Roadway's drivers notified it that he needed the assistance of a helper in order to deliver a load of 31,787 pounds of soil pipe weighing approximately 65 pounds each. When Roadway questioned the need of a helper, this employee, according to Gunn's deposition, contacted Local 249 which in turn notified Roadway that if a helper did not assist the driver on that particular delivery, the Local would call a strike at mid-

night. Roadway ordered the driver to deliver the load without a helper, and when he refused, it terminated his employment. Local 249 called a strike on August 9, 1961. After this date Roadway and Local 249 held approximately nine meetings in an effort to iron out the helper problem. At one of these meetings held on November 21, 1961, Roadway submitted a written "Memorandum of Understanding" setting forth terms agreed upon for restoration of normal operations at the Pittsburgh terminal. In the main they dealt with the solution to the helper problem, the designation of starting times, and concessions to be made to Roadway, such as the reduction in vacation pay, the suspension of its obligation to recognize daily or weekly "guarantees" or seniority for a reasonable time not to exceed January 1, 1962, and that the employees be considered in a formal layoff status until they return to work. The memorandum also contained a declaration that an attached writing entitled "Maintenance of Standards" represents the only conditions of employment which exceed the written agreement. Local 249 refused to sign the memorandum. Further meetings failed to bring the parties together, and the strike continued until Roadway closed the Pittsburgh terminal on January 13, 1962.

■ At the outset Local 249 points out that the contract attached to the complaint as "Exhibit A" is one between Joint Council No. 40, representing 12 local unions, and the Association, and not one between Local 249 and Roadway, who is a stranger to that document. This fact is not an insurmountable obstacle to Roadway's claim. Parties may agree to become bound by a contract negotiated by other parties. For example, see Line Drivers Local No. 961 of International Broth. of Teamsters etc. v. W. J. Digby, Inc., 218 F.Supp. 519 (D.C.Colo.1963).

■ Roadway does not seriously dispute that a contract did not come into existence on June 1, 1961. On that date Local 249 informed Roadway that it would not sign the new agreement unless the parties first entered into a memorandum of understanding. No such memorandum was entered into. Moreover, the complaint does not ask for damages dating from June 1, but from August 9, 1961, instead. But there were further meetings and discussions between the parties looking forward to an agreement. On or about June 15, Roadway claims, Local 249 accepted the written agreement as setting forth conditions under which the employees would return to work even though it did not. sign it. Citing H. J. Heinz Co. v. N. L. R. B., 311 U.S. 514, 523–26, 61 S.Ct. 320,. 85 L.Ed. 309 (1941), the District Court concludes: "Hence the peculiar characteristics of labor contracts confirm the general rule of contract law that no contract was created under the circumstances of the case at bar in the absence of formal execution." 211 F.Supp. 796, at p. 798 (W.D.Pa.1962). We do not read the Heinz case as holding that there is no contract unless there is a formal execution. On the contrary the case stands for the proposition that where a union and an employer reach an agreement concerning working conditions of employees, the employer has a duty to execute a written agreement and he may be required to sign if he refuses after being requested to do so by the union, and his refusal is an unfair labor practice. So the fact that the proposed written agreement was not signed did not demonstrate as a matter of law that there was no contract. See Hamilton Foundry & Machine Co. v. International Molders & Foundry Workers Union of North America, 193 F.2d 209, 213–14 (C.A.6, 1962); Rabouin v. N. L. R. B., 195 F.2d 906, 910 (C. A.2, 1952); N. L. R. B. v. Local 825, International Union of Operating Engineers, AFL-CIO, 315 F.2d 695 (C.A.3,. 1963); Standard Oil Co. v. N. L. R. B.,. 322 F.2d 40 (C.A.6, 1963).

■ A party, who has originally insisted that both parties sign a document before a mutually binding agreement may come into existence, may dispense

with that requirement. Section 28A of Williston on Contracts, states in part:

" * * * Parties rarely express a direct intention as to the moment when they conceive themselves to be bound by a contract. The law attaches legal obligations, whether they will or not, when their acts fulfill the requirements of the law. If, therefore, the parties have agreed upon all the terms that a proposed written contract shall contain, there is a contract, for they have made positive promises to one another, certain in their content and sufficient as consideration for one another * * * Where the parties act under a preliminary agreement, they will be held to be bound, notwithstanding the fact that a formal contract has not been executed; and *it seems that even where signing by both parties is originally contemplated, subsequent agreement manifested by acts may dispense with the requirement.*" (Italics ours.) Also see Restatement of Contracts, § 26.

It is true that negotiations continued on disputed issues after June 15, and the actions of a party may have some evidentiary bearing as to his frame of mind at an earlier time. But whether Roadway believed or should not have believed there was an agreement was a question of fact to be resolved by the tryer of facts. Local 249 insists that since the essential terms of the proposed "Memorandum of Understanding" dated November 21, 1961, are contradictory to those of the written agreement, one must conclude as a matter of law that no contract was ever entered into on or about June 15. For example, it says that the terms concerning the assigning of helpers were in derogation of Article VI, § 1, of the written agreement which provides that all conditions of employment in his individual [employer's] operation relating to * * * general working conditions shall be maintained at not less than the highest standards in effect at the time of the signing of the Agreement * * *."

However, the record does not show what the "highest standards" were immediately prior to June 15, the previous contract having expired May 31, 1961. Merely because some of the essential terms of the "Memorandum of Understanding" are in an area covered by the written agreement does not justify as being the only reasonable one an inference that the parties never accepted the terms of the written agreement. Moreover, Article VI also provided that individual employers and the unions should reduce to writing within six months from the effective date of the contract any such "better conditions" to be protected by that article, and submit such written conditions to a committee for final approval, and disagreements as to such conditions were expressly subject to the grievance procedure. The purpose of these terms is obvious. Local 249 wanted to be in a position to benefit immediately from a higher wage scale and increased welfare benefits under the written agreement, while it negotiated the resolution of the "maintenance of standards". As a matter of fact it had agreed with the Association prior to the execution of the new agreement that the details under the maintenance of standards article would be reduced to writing at a later date rather than postpone the signing of the new agreement until those details were agreed upon. In addition there is no specific language in the new agreement that refers to the helper problem. If problems on that subject were to arise after the written agreement came into existence, they could be resolved under the grievance procedure of that agreement.

The District Court attached importance to the admitted fact that in the transportation of freight by motor carrier industry the principle of "No contract, no work" is not practiced. The only reasonable purpose that the establishment of that fact can have is the preventing of the drawing of an inference by the fact finder that a contract existed merely because the employees returned to work; it does not preclude

a finding that a contract existed. Employees at work and the existence of a contract would not be inconsistent findings here.

■ Whether Local 249 ever recognized that the written contract was binding upon it is a genuine issue of a material fact. Therefore, there were triable issues of fact, precluding the entry of summary judgment. Consequently, it was reversible error for the District Court to render summary judgment in favor of Local 249.

■ Roadway contends here that Local 249 should be estopped from denying the existence of the contract by reason of its having accepted the benefits thereunder. This contention does not appear to have been made in the District Court. Roadway did not file a cross-motion for summary judgment. It could not have done so unless it were aware that the District Court would consider Local 249's motion as having been filed under Rule 56. There is nothing in the record from which we may glean that the District Court gave such an indication.[3] Hence Roadway did not have a fair opportunity to present a cross-motion. But we need not decide here whether summary judgment may be entered in its favor in the absence of its not having requested the District Court to do so for we think its contention is premature. Outside the statement made by Gunn in his deposition to the effect that Roadway "put the operation back into effect applying the terms and conditions as spelled out in the written agreement," there is no evidence as to the rate of pay the employees received after June 15, 1961, or the amounts paid over to Local 249 under the heading of pensions and welfare funds. And acceptance of wages by the employees do not bind the union in this regard. Hamilton Foundry

& Machine Co. v. International M. & F. Workers, supra, 193 F.2d at p. 215.

Accordingly, the judgment of the District Court will be reversed and the matter remanded for further proceedings.

---

3. In his treatise on federal practice, Professor Moore warns: "Care should, of course, be taken by the district court to determine that the party against whom summary judgment is rendered has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried, and that the party for whom summary judgment is rendered is entitled thereto as a matter of law." 6 Moore's Fed.Pract. (2nd Ed.) ¶ 56.12.