**Karl R. SMITH, James W. Reed and Joseph Wachter, Plaintiffs,**

v.

**PITTSBURGH GAGE AND SUPPLY COMPANY, Defendant.**

**Civ. A. No. 66–1380.**

United States District Court,
W. D. Pennsylvania.

Feb. 24, 1971.

James R. Orr, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for defendant.

Joseph M. Maurizi, Suto, Power, Balzarini & Walsh, Pittsburgh, Pa., for plaintiffs.

OPINION

WEIS, District Judge.

More than ten years have passed since the plaintiffs' employment with the defendant company was terminated in January of 1961. In attempts to prove that the discharges were in violation of a valid collective bargaining agreement, suit was commenced in the state courts of Pennsylvania;[1] charges were filed before the National Labor Relations Board; litigation was instituted in this District Court which resulted in a dismissal[2] and affirmance by the Court of Appeals;[3] followed by the commencement of this suit which also was dismissed[4] but was then remanded by the Court of Appeals "For a full hearing on the issue of the existence of the contract."[5]

■ Pursuant to this instruction, the matter was tried to a jury which determined that a valid contract was in force between the Union, of which the plaintiffs were members, and the defendant and that the Company had wrongfully terminated the services of the plaintiffs in January of 1961. By stipulation of the parties, reached before the verdict was returned, it was agreed that if damages were to be awarded, the computation would be performed by a Master to be selected by the parties.

Now before the Court are motions for judgment n.o.v. and for new trial filed by the defendant.

Since the background of this case has been set out in more detail in the many reported opinions, only a brief outline of those operative facts which might have been found by the jury will be discussed here.

For a number of years before 1959, the Steamfitters Local No. 449 and its predecessor union had entered into collective bargaining agreements of a one year duration with the Pittsburgh

1.  412 Pa. 171, 194 A.2d 181 (1963).

2.  245 F.Supp. 864 (W.D.Pa.1965).

3.  361 F.2d 219 (3rd Cir. 1966).

4.  270 F.Supp. 192 (W.D.Pa.1967).

5.  388 F.2d 983 (3rd Cir. 1968).

Gage & Supply Company. On June 1, 1959 a new contract purporting to be in effect until June 1, 1960 was signed by the Union and the employer.

Pursuant to a provision in the contract, the Union notified the Company by letter of February 22, 1960 of its intention to terminate the agreement on April 30, 1960. Thereafter there were bargaining sessions between officers of the defendant Company and a committee of the Union, which included the Chief Business Agent of the Local and the shop steward, which resulted in the Company granting a "package" of 37½ cents to be divided between wages, a major medical plan and a proposed pension. However, the terms of the proposed pension arrangement were not fully determined but were to await the results of an actuarial study. According to Hagmaier, the Chief Business Agent, the parties "shook hands" on an agreement which was to continue the working provisions of the 1959–60 contract, with the addition of the 37½ cents package, until a new writing could be prepared embodying the as yet unformulated pension plan. In July of 1960, the Company did proceed to put the major medical plan into effect and the increased earnings, effective as of May 1, 1960, were paid to the employees.

A memorandum dated July 20, 1960 was prepared by the defendant's Vice President, E. W. Olson, on Company stationery stating, "The working provisions of the 1959 agreement between Pittsburgh Gage & Supply Company and employees of Local Union No. 449 shall remain the same in the new May 1, 1960 to April 30, 1963 agreement. This letter will cover the general financial aspects of the agreement made between Pittsburgh Gage & Supply Company and its employees with Local Union 449 during the May 1, 1960 contract period." The document then lists the terms of the 37½ cents "package." While the Company claimed that this writing was only an aide-memoire for Olson's private use, the plaintiffs asserted that it was given to the shop steward by the Vice President who suggested the addition of several handwritten stipulations relating to sick leave and holidays.

On August 26, 1960 Olson sent a letter addressed to Karl Smith, the steward of 449, stating, inter alia, "In conformity with your request, we would like to assure you that it is our intention to live up to the basic provisions of the contract between Pittsburgh Gage & Supply Company and Local 449 which expired May 1, 1960. Naturally, there will be certain changes in the new contract which we feel sure are understood by your Union and by us, and these changes would be embodied in the new contract. We would like to feel we might work in an air of mutual trust and confidence in one another during the rather detailed studies which are being made with regard to pensions and which are presently holding up the signing of a new contract * * * "

Four days later the "Pittsburgh Gage 449 Union Shop Committee" sent a memorandum to Mr. Olson stating, "This will officially notified [sic] you that on August 29, 1960 the members voted unanimously to accept your offer of July 20, 1960. The Union members agree with you to continue to work under the terms of the 1959 agreement between Pittsburgh Gage and Local Union No. 449 until a new agreement is sign [sic]. Very truly yours, Karl R. Smith, Earl Steward, Local 449 Shop Committee."

On or about December 31, 1960 a contract proposal was submitted to the employees of Pittsburgh Gage containing provisions for a pension substantially less than the Union members had expected, but embodying all of the other items of wage increases, major medical plan, and sick leave and holidays which had been in effect for some months. The employees rejected the proposed contract, but continued to work.

Thereafter, in the course of a letter dated January 21, 1961 and written to Smith, the Vice President of the Company said, "We are working under the provisions of the old contract until a new

one is signed. We hope we can work in an air of mutual trust during our negotiations. If there are any further questions, please contact your Union officers."

Nevertheless, when Smith protested his own and the other plaintiffs' "layoff" that same month as being in violation of the 1959–60 writing, the Company contended that there was no contract in force. Smith, however, filed a letter with the Business Agent of the Local asserting a grievance by reason of his layoff but the Union did not actively seek relief through arbitration nor did the plaintiffs insist upon it.

■ Though the defendant continued to dispute the existence of an interim contract throughout the trial, the jury rejected the Company's point of view and found specifically that there was a valid agreement in effect which made the termination of plaintiffs' employment wrongful. These were questions of fact, not of law,[6] and there is ample support in the record to support the jury's answers to Interrogatories[7] on these points.

Defendant also argues that plaintiffs are not entitled to recover because of failure to prove an attempt to exhaust the contractual grievance procedures ultimately leading to arbitration. The jury returned an affirmative answer to an Interrogatory in the following form: "Did the plaintiffs in good faith attempt to exhaust the grievance and arbitration procedures of the contract?"

The jury was instructed that individual employees must use contract grievance procedures as a general rule but that in arriving at an answer to the question, consideration might be given to the matter of whether the employees were prevented from exhausting the grievance procedures by the Union's wrongful refusal to process their claim, or by the conduct of the Company which might be considered a denial or repudiation of the contract itself, or whether the plaintiffs voluntarily abandoned the grievance procedure.

The Company's position has been consistent throughout this lengthy litigation that there was no contract in effect in January of 1961 when the plaintiffs were discharged. Under the circumstances, it could very well be that as a matter of law the plaintiffs were not required to attempt any grievance procedures and therefore the defendants were not entitled to have the question submitted to the jury.

In Vaca v. Sipes,[8] the Supreme Court outlined the problem as follows:

"Since the employee's claim is based upon breach of the collective bargaining agreement, he is bound by terms of that agreement which govern the manner in which contractual rights may be enforced. For this reason, it is settled that the employee must at least attempt to exhaust exclusive grievance and arbitration procedures established by the bargaining agreement. Republic Steel Corporation v. Maddox, 379 U.S. 650 [85 S.Ct. 614, 13 L.Ed.2d 580]. However, because these contractual remedies have been devised and are often controlled by the union and the employer, they may well prove unsatisfactory or unworkable for the individual grievant. The problem then is to. determine under what circumstances the individual employee may obtain judicial review of his breach-of-contract claim despite his failure to secure relief through the contractual remedial procedures.

6. See Roadway Express, Inc. v. General Teamsters, etc., Local 249, 330 F.2d 859 (3rd Cir. 1964).

7. 1. Was there a contract, oral or in writing between the Union and the Company at the time of the plaintiffs' layoff or discharge?
. Yes __X__ No _____

2. Was the plaintiffs' employment terminated by the Company in violation of contractual rights?
Yes __X__ No _____

8. 386 U.S. 171, 184–185, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1966).

"*An obvious situation in which the employee should not be limited to the exclusive remedial procedures established by the contract occurs when the conduct of the employer amounts to a repudiation of those contractual procedures.* [Citation] *In such a situation* (and there may of course be others), *the employer is estopped by his own conduct* to rely on the unexhausted grievance and arbitration procedures as a defense to the employee's cause of action." [Emphasis supplied]

See also Boone v. Armstrong Cork Company,[9] where it was said:

"Of course, if the company should refuse to resort to the grievance procedure no defense of failure to exhaust contractual remedies could be successfully asserted and the suit must proceed."

■ We must decline to accept the defendant's contention that the plaintiffs are barred because of failure to exhaust contractual procedures.

The Company also insists that this Court should refer the matter to arbitration once the existence of a contract has been established and the issues of wrongful termination and assessment of damages should be determined by the contractually mandated arbitration procedure. However, this contention was also considered in Vaca v. Sipes, supra, and rejected by the Supreme Court when it said:

"For this reason, an order compelling arbitration should be viewed as one of the available remedies when a breach of the union's duty is proved. But we see no reason inflexibly to require arbitration in all cases. * * * In other cases, *the arbitrable issues may be substantially resolved in the course of trying the fair representation controversy. In such situations, the court should be free to decide the contractual claim and to award the employee appropriate damages or equitable relief.*" (386 U.S. at p. 196, 87 S. Ct. at p. 920) [Emphasis supplied].

■ It is true, of course, that the law favors arbitration of labor management grievances.[10] However, when the testimony to establish the existence of a contract necessarily ranges over details encompassed within the question of wrongful termination of employment, it would be inefficient judicial administration to have another hearing on the matter when it could be resolved quickly by the one jury. The cases cited which were concerned with fact situations where the party did not deny the existence of the contract itself are not persuasive.[11]

■ The defendant also contends that the Court erred in allowing the testimony of Harry W. Hagmaier as a rebuttal witness. This, however, is a matter of discretion in the trial court.

It had become apparent as the case neared its end that Hagmaier was a critical witness on the question of whether a "handshake" agreement had been reached. To have excluded his testimony on the grounds that it should have been offered sooner would not have been in the interest of justice.

■ One other matter remains for discussion. The defendant contends that res judicata bars this action. On June 23, 1967 another member of this Court entered a judgment dismissing the case on that basis.[12] An appeal was taken to the Court of Appeals which remanded in a brief Opinion, saying, inter alia:

"We do not rule on the question of res judicata."

9. 384 F.2d 285, 292 (5th Cir. 1967). See also Corbin on Contracts § 1443.

10. United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403.

11. e. g. Desrosiers v. American Cyanamid et al., 377 F.2d 864 (2nd Cir. 1967); Rothlein v. Armour & Co., 391 F.2d 574 (3rd Cir. 1968); Rivera v. N.M.U. Pension and Welfare and Vacation Plan, 288 F.Supp. 874 (E.D.La.1968).

12. 270 F.Supp. 192 (W.D.Pa.1967). See Footnote 4.

This Court is bound by the ruling of June 23, 1967 and any further consideration of the Application of res judicata is the function of the Court of Appeals which reserved decision on that point.

We conclude that the Motions for judgment n.o.v. and for a new trial must be denied. An appropriate Order will be entered.