**DANIEL CONSTRUCTION COMPANY, INC., d/b/a Daniel Construction Company of Alabama, Plaintiff,**

v.

**TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS, LOCAL UNION NO. 991, Defendant.**

Civ. A. No. 7785–73–P.

United States District Court,
S. D. Alabama, S. D.

Sept. 25, 1973.

Willis C. Darby, Jr., Mobile, Ala., Thompson, Ogletree & Deakins, Atlanta, Ga., for plaintiff.

Otto E. Simon, Mobile, Ala., for defendant.

## ORDER

PITTMAN, Chief Judge.

This action was initiated by plaintiff, Daniel Construction Company, Inc., on August 9, 1973. By its complaint filed that day, Daniel sought to enjoin a threatened strike by the defendant union at its Dothan, Alabama, jobsite, and also sought to have an arbitration award in defendant's favor set aside by this court. By agreement on August 10, 1973, this court issued a temporary injunction against any strikes or work stoppages by defendant at Dothan, pending the outcome of this suit. The union filed its answer to the complaint on August 20, 1973. A hearing on the merits was conducted by this court, sitting without a jury, on August 22, 1973.

## FINDINGS OF FACT

The plaintiff is a corporation created and existing under and by virtue of the

laws of the State of South Carolina and has offices and places of business in Birmingham and Dothan, Alabama.

The defendant is a labor organization representing employees in an industry affecting commerce, since it is an organization in which employees participate and which exists for the purpose of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, and conditions of employment. The defendant maintains its principal office in Mobile, Alabama.

In early 1970, the plaintiff entered into a contract with Alabama Power Company which requires that the plaintiff act as the general contractor for the construction of the Joseph M. Farley Nuclear Plant. This plant is being constructed on an 1,850 acre site near Dothan, Alabama. The plant will consist of two units equipped with two pressurized water reactors which will drive turbine generators to produce electrical output. The approximate value of the project is in excess of $400 million. The plaintiff is being assisted in the construction of the project by 13 subcontractors. The plaintiff employs approximately 2,990 employees on the project, and its subcontractors employ an additional 825 employees.

On September 24, 1970, the plaintiff entered into a single collective bargaining agreement, hereinafter called the project agreement, with 16 labor organizations, including the defendant. Under its terms, this project agreement applies to all work performed by the plaintiff and its subcontractors on the said construction project and remains in full force and effect during the entire period of the construction project.

Relevant clauses contained in the project agreement include:

## ARTICLE VII

### GRIEVANCE PROCEDURE AND ARBITRATION

*Section 1.* In the event the Union claims that the Employer has failed to comply with the terms and conditions of this agreement, the procedures provided for in the Union's local working agreement shall be followed without any work stoppage. The Employer shall select its own representatives to be used in such procedures.

## ARTICLE XI

### WAGES AND BENEFITS

*Section 1.* The wage rates to be paid and the fringe benefits to be provided by the Employer on the said construction project shall be those provided in the current local working agreement between the Union and the currently recognized contractors' bargaining representative, a copy of which is attached hereto. Any future increases in the hourly wage rates and existing fringe benefits negotiated by the Union and the contractors' bargaining representative will be placed into effect on the said construction project as to the affected craftsmen *at the time the new local working agreement is executed by the Union and this contractors' bargaining representative* . . . (Emphasis added.)

## ARTICLE XII

### LOCAL WORKING AGREEMENT

*Section 1.* With respect to all work performed by employees represented by the Union on the said construction project, the parties agree to be bound by the terms of the Union's local working agreement, attached hereto and made a part hereof, with the currently recognized contractors' bargaining representative, and any future local working agreements entered into by the Union and this contractors' bargaining representative as a replacement for the attached said local working agreement. . . .

The project agreement contains no provision which requires the payment of any shift differential to employees working on any particular shift. However, as noted *supra,* Articles XI and XII of the project agreement bind the plaintiff

to "the terms of the Union's local working agreement . . . with the currently recognized contractors' bargaining representative, and any future local working agreements entered into by the Union and this contractors' bargaining representative. . . ." With respect to the defendant, the "recognized contractors' bargaining representative" was, and is, the Mobile Chapter, Associated General Contractors of America, Inc., hereinafter called the AGC. This is true, since the AGC is the only construction employer group which negotiates with the defendant and has entered into agreements with unions in the Mobile area "for and on behalf of its members and the other employers that execute or ratify this agreement." See plaintiff's Exhibit No. 3. Compare plaintiff's Exhibit No. 4.

During the relevant period, the AGC negotiated two forms of agreement with the union in the Mobile area. They negotiated a so-called "master local agreement," which was executed by the AGC and various labor unions, including the defendant. These master local agreements negotiated during the relevant period set forth uniform provisions for all signatory unions on such subjects as union recognition, production, apprenticeship, holidays, workmen's compensation, referral of applicants, the handling of grievances including arbitration, jurisdictional disputes, health and welfare benefits and pensions. See plaintiff's Exhibits Nos. 3 and 4. Attached to the master local agreement as Exhibit "A" were the wage rates to be paid all craftsmen, including Teamsters.[1] In addition, the AGC negotiated separate "local work rules" with each of the craft unions, including the defendant.

It is undisputed that the AGC and the Mobile area unions executed master local agreements at all relevant times, which the plaintiff was bound by under Articles XI and XII of its project agreement.

Article IX of the 1970 master local agreement provided that: "Attached hereto and made a part hereof are exhibits "B", "C", "D", "E", "F", "G", "H", "I", which consist of the working rules of the unions as mutually agreed to by the parties hereto . . ." Despite the language of Article IX, it is undisputed that at the time the parties executed the 1970 master local agreement the purported local work rules of the defendant were not attached. The more serious question, discussed *infra,* is whether or not the 1970 local work rules had actually been agreed upon by the parties.

Article IX of the master local agreement was amended in 1972 to say that: "Working rules of each craft shall become a part ·of this agreement *when signed* by the Mobile Chapter, Associated General Contractors of America, Inc. and the union which represents the craft. The contractors and the unions shall be governed by such working rules. No union rules other than those agreed upon shall have any application to any work performed by employees pursuant to this agreement." (Emphasis added.) The 1972 local work rules for Teamsters were not signed by the AGC and the defendant. The questions of whether or not the parties orally extended older work rules, and whether or not any such oral extension was legally effective, are dealt with *infra.*

The master local agreements, as the project agreement, do not contain any provision requiring the payment of any shift differential to employees working on a particular shift. However, the

1. The executed copies of the master local agreements, effective on July 1, 1970 (Plaintiff's Exhibit No. 3), and July 1, 1972 (Plaintiff's Exhibit No. 4), respectively, did not contain Exhibit "A". However, the testimony of S. A. Alsup, Business Manager, Mobile-Pensacola,

Florida Building & Construction Trades Council, showed that the wage rates listed in Exhibit "A" of the so-called green book (plaintiff's Exhibit No. 9) represented a true copy of the Exhibit "A" attached to both of these master local agreements.

*1968 local work rules of the defendant, which were attached to the project agreement, contained a provision that*: ". . . when there are three shifts employed, 7 hours shall constitute a day's work for each shift, for which a regular wage of 8 hours shall be paid." See plaintiff's Exhibit No. 1. In the various proposals for amendments to these local work rules in 1970 and 1972, neither the AGC nor the defendant proposed to amend this particular language.

On or about May, 1971, the plaintiff began working certain of its employees on shift work. In September, 1971, duly authorized agents of the defendant complained to the plaintiff that since September 13, 1971, the plaintiff was not in compliance with Article 4 of the Master Local Working Agreement concerning the rates of pay for shift work. All other provisions of the local work rules were complied with and had been complied with since mid-1970. In February, 1973, both parties agreed to arbitrate the dispute.

The arbitrator in an award dated July 9, 1973, interpreted Article 4 of the work rules in favor of the defendant. The basis of the award was the fact that the plaintiff breached its contract with the defendant. The award of the arbitrator states as follows:

> "Every member of the Teamsters Union is entitled to 8 hours pay for 7 hours work when three shifts were employed on the project, or for 8 hours pay for 7½ hours work when two shifts were employed, and the retroactive matter should go back to September 14, 1971. . . . ."

He rejected the plaintiff's contention that the grievance was untimely presented for arbitration because of the defendant's laches.

The award stated it should be complied with no later than midnight July 31, 1973.[2] On August 6, 1973, plaintiff attempted to reopen the arbitration hearing on the ground that the defendant had misrepresented to them that the local work rules had been agreed on between the defendant and the AGC when in fact the plaintiff contended no such agreement had been reached, therefore, Article 4 had no application.

On August 8, 1973, the arbitrator denied the rehearing. On August 9, 1973, the complaint herein was filed in this court.

The critical questions before this court are (1) whether or not there was a collective bargaining agreement entered into which included local working rules, and particularly Section 4 therein, and (2) were there misrepresentations by the defendant on which the plaintiff relied concerning the work rules. The interpretation of the arbitrator is not attached.

The plaintiff acknowledges that the local work rules were signed by the AGC but contends that at no time has the union signed them, therefore the union is not in compliance with Article 17 which provides "these working rules . . . are void unless signed and dated by the parties. . . . "[3]

The evidence is uncontradicted that for many years (during the life-time of the principal union negotiator who has represented the union for over 40 years), the prevailing custom has been that on receipt of the working rules signed by the AGC the defendant would publish the master contract and the working rules and forward it to the AGC. Unless there were errors noted by the AGC, the parties considered themselves bound and abided by them as published.

Mr. Joe Martin, president of Mobile Builders, Inc., and the former president of the Mobile AGC, testifying for the plaintiff, testified that the AGC is the

---

2. See Plaintiff's Exhibit No. 10, p. 28.

3. See Plaintiff's Exhibit No. 5.

bargaining unit for Mobile area contractors in their negotiations with local unions, including the defendant. He participated in the negotiations of the 1970–1972 collective bargaining agreements between the AGC and the union. He stated a master agreement between AGC and nine craft unions represented by the Trades Council was first negotiated, then committees of AGC members met with the various crafts to negotiate local working rules. He further testified the working rules were usually signed before the master agreement but oftentimes the local work rules of some unions were not agreed upon by the time the master agreement was promulgated. He verified that the practice had been for the union to send out a printed manual containing the master agreement and the local working rules to the members of the AGC and the standard procedure was for the AGC to inform the Trades Council of any errors in its manual. He further stated that the 1970 unsigned working rules had followed this practice and had been treated as executed.

A comparison by him of the 1963–1965 unsigned local working rules were identical with the 1970 unsigned rules including the shift differential in question.

The Teamsters asked for changes in their working rules in 1972 on issues other than the shift differential. It has been the past practice that the old rules continued in effect until negotiated changes were agreed upon, or, failing an agreement on proposed changes, the old rules remained in effect. The 1972 negotiations failed to result in new agreement, and the new manual for the 1972–1974 period, which is in the process of publication, is identical with the 1970–1972 manual.

The court finds that the rules prepared for publication for the 1972–1974 period are identical with the 1963–1965 and 1970–1972 rules. The court further finds that the bargaining parties by their conduct and actions for many years of following these rules without the defendant signing them have ratified and accepted them making them binding the same as if they had been signed by the defendant.

The plaintiff accepted in the master project agreement the local rules agreed upon between the defendant and the AGC in Mobile. The evidence is that the Martin Company and members of AGC at this time in the 1972–1974 period are following the shift differential as set out in the local rules for the 1970–1972 period which is being republished in the 1972–1974 manual. The plaintiff has not offered any evidence to the contrary. They will not be heard to complain at this time of the practices the parties have followed for many years in reaching their agreements for the 1970–1972 nor 1972–1974 periods.

The court further finds the defendant has acted in good faith in its representation to the plaintiff concerning the agreements to the local rules between them and the AGC and therefore has not been guilty of misrepresentations as alleged by the plaintiff.

## CONCLUSIONS OF LAW

■ The existence of a collective bargaining agreement is determined by the usual contract rules of offer and acceptance. United Steelworkers of America v. Rome Industries, Inc., 321 F.Supp. 1170, 1174 (N.D.Ga.1970), aff'd. 437 F.2d 881 (5th Cir. 1970). Teamsters, Chauffeurs, Warehousemen & Helpers Local Union 524 v. Billington, 402 F.2d 510 (9th Cir. 1968). Although generally a contract must be written and executed to be effective, the National Labor Relations Act does not require collective bargaining agreements to be written. 29 U.S.C. § 158(d), Rabouin v. National Labor Relations Board, 195 F.2d 906, 910 (2nd Cir. 1952).

■ The Fifth Circuit has recognized that collective bargaining agreements need not be written to be enforceable.

Warrior Constructors, Inc. v. Int'l. Union of Operating Engineers, Local 926, 383 F.2d 700 (5th Cir. 1967). Since the absence of a written contract is not necessarily dispositive of this issue, the intention of the parties to be bound by oral agreements or to accept performance in contemplation of a written draft is important to the decision of the question of the existence of a contract. *Rome Industries, supra,* 321 F.Supp. at 1174.

In the *Rabouin* case, there was an agreement reached between the union and representatives of various employers. The union mailed signed copies of the new contract to the members of the management group, to be signed and returned. Rabouin failed to sign or return the contract, but complied with its terms for several months. At a date approximately one year after receipt of the contract, Rabouin failed to comply with various parts of the contract and the union struck. The court rejected Rabouin's claim that he was not bound by the contract, which he had not executed, because it was inconsistent with his prior action complying with the contract and also because it was "without legal substance." 195 F.2d at 910. Since the National Labor Relations Act does not require a written contract, "Rabouin's failure to sign the contract during his compliance with it" was not sufficient to invalidate the agreement. 195 F.2d at 910.

█ If the signature of both parties was expected, this requirement can be waived. Roadway Express, Inc. v. General Teamsters, Chauffeurs and Helpers Union Local 249, 330 F.2d 859 (3rd Cir. 1964). When the parties have agreed upon the terms of a contract, it comes into existence because there have been mutual promises and sufficient consideration. And "even where signing by both parties is originally contemplated, subsequent agreement manifested by acts may dispense with the requirement." 330 F. 2d at 864.

In a case similar to *Rabouin,* the union sent an agreement to a contractor, which was signed and returned to the union. No labor representative ever signed the contract and the union subsequently sought to disavow the contract on this basis. When the contractor sought specific performance, the court held that the union was bound by the contract.

"That the Union failed to sign the agreement is immaterial for any written contract though signed only by one of the parties binds the other if he accepts it and both act in reliance on it as a valid contract."

National Labor Relations Board v. Int'l. Union of Operating Engineers, Local 825, 315 F.2d 695, 699 (3rd Cir. 1963).

The plaintiff had agreed with the defendant to be bound by the local work rules in effect or negotiated between the defendant and the AGC in Mobile. The defendant and the AGC have been bound by the same local rules since 1963 and probably for a long time prior thereto. In most instances, the rules have not been signed by the defendant.

The longstanding practice between the AGC and the defendant has been for the defendant to publish the manuals, including the local work rules, which were sent to the AGC members for the purpose of being checked for errors. If the manual contained errors the defendant would correct them. In actual practice, there have been few, if any, errors.

If the AGC contemplated that no local rules would be in effect until signed by the defendant, the later actions of the AGC have dispensed with the need for the union's signature.

█ The local work rules have been followed by the AGC and the plaintiffs since mid-1970 to the time of trial, except the shift pay in question, although unsigned by the defendant. Since that time the AGC nor any member thereof have objected to any portion of the work rules as they appeared in the manual.

Since the AGC has seen fit to follow the work rules as they appeared in the manual, and the previous work rules until new ones are agreed upon, there can be no contention that the rules are not effective because of the union's non-execution. The parties and the AGC have demonstrated their intention to be bound by the rules as published in the manual and bound by the procedures which have been of longstanding practice in Mobile between the AGC and the defendant. Any contention that the contract is not valid is inconsistent with the actions of the parties to the agreement.

Considering the longstanding practice of the Trades Council, including the defendant, of including the local rules in its published manuals, which are sent to AGC members for the purpose of being checked for errors, the decision in Hamilton Foundry & Machine Co. v. Int'l. Molders & Foundry Workers Union of North America, 193 F.2d 209 (6th Cir. 1952) is apposite. The court in *Hamilton* points out that a valid contract can be entered into even though no written document is signed. Agreeing that the general rule is that an unsigned contract cannot be enforced if the parties agreed not to be bound until both signed, the Sixth Circuit nonetheless states:

> "[I]t is also a recognized exception that if the party sought to be charged intended to close a contract prior to the formal signing of a written draft, and such written draft is viewed by the parties merely as a convenient record of their previous contract, he will be bound by the contract actually made though the signing of the written draft be omitted. . . . It is essentially a question of intention."

193 F.2d at 214. In light of the testimony that the parties to the agreement have treated it as valid and have complied with its terms, the parties have demonstrated their intention to be bound by the local rules.

Therefore, it is Ordered, Adjudged and Decreed that judgment is for the Defendant.

Costs are taxed against the plaintiff.