**LINE DRIVERS LOCAL NO. 961 OF the INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Plaintiff,**

v.

**W. J. DIGBY, INC., a corporation, Defendant.**

Civ. A. No. 7328.

United States District Court
D. Colorado.

June 12, 1963.

Myrick, Smith & Criswell, John A. Criswell, Englewood, Colo., for plaintiff.

Albert B. Dawkins, Robert H. Kiley and Paul M. Hupp, Denver, Colo., for defendant.

DOYLE, District Judge.

This matter was tried to the Court on March 11 and 12, 1963; thereafter, briefs were filed and the matter was finally submitted on June 10, 1963. The court's findings are incorporated in this memorandum and formal findings are unnecessary.

520

The action seeks specific performance of an agreement between the plaintiff union and the defendant employer, which agreement was signed on June 30, 1961. The terms of this memorandum agreement were such that the defendant employer agreed to be bound by the terms and provisions of the Western States Area Master Freight Agreement which was then being negotiated. The defendant also agreed to execute a contract which contained all the terms and conditions of the Western States Area Master Freight Agreement, together with supplements thereto.

The defendant's position is that Exhibit 1, the memorandum referred to, is unenforceable for vagueness, because of duress and for other reasons which will be discussed in detail herein.

In addition to Exhibit 1, which is primarily in issue here, there are several other contracts between these parties which are related to the present controversy and which, for purposes of clarity, may be described as follows:

Plaintiff's Exhibit 2—Western States Area Master Freight Agreement for period of July 1, 1961 to June 30, 1964;

Plaintiff's Exhibit 3—Western States Area Over the Road Single Man and Sleeper Cab Supplemental Agreement to Plaintiff's Exhibit 2;

Plaintiff's Exhibit 4—Over-the-Road Motor Freight Agreement, Sleeper Cab Operations for period of May 1, 1959 to July 1, 1961;

Plaintiff's Exhibit 5—"The Old Perishable Foods Contract", admittedly in effect between the parties, dated March 1, 1957 to November 1, 1958;

Defendant's Exhibit A—"Master Perishable Foods Agreement" dated November 1, 1958 to April 1, 1962, signed by defendant June 2, 1959;

Defendant's Exhibit B—Letter of Understanding between the parties, dated March 27, 1959, purporting to bind defendant to pay for "dry freight" transportation the rates prescribed in plaintiff's Exhibit 4.

In order to further clarify the present problem it is necessary to relate the collective bargaining history as between the plaintiff and the defendant.

Prior to January, 1958, defendant, a trucking concern, was primarily engaged in hauling "exempt" commodities, that is, those not requiring an I.C.C. permit. At this time defendant acted as an agent of another carrier, Wells Truckway, in the transportation of meat from Denver to California. In December, 1957, however, defendant obtained an I.C.C. permit from another company, which permit authorized defendant to carry "general commodities" from any point within fifty miles of Boulder, Colorado, to destinations within the State. At the time of the issuance of this permit, plaintiff union represented the over-the-road drivers of the defendant and plaintiff's Exhibit 5, described above, was in force and was due to expire in November, 1958.

There was then in existence between plaintiff union and certain other carriers, a so-called "dry freight" agreement. In the course of negotiations between these other carriers and the unions, a "lock-out" took place during August, 1958. In the course of this lockout, most common carriers west of Denver ceased operations. During this period W. J. Digby, who was then President of defendant, called Harry Bath, who was president of plaintiff, and inquired whether or not the defendant would be struck if it commenced "dry freight" operations. Bath replied that a strike would not occur and defendant thereupon obtained a temporary I.C.C. permit allowing it to take dry freight during the "lock-out." Digby at this time agreed to pay the rates prescribed by the "dry freight" agreement.

As noted above, plaintiff's Exhibit 5, which was the so-called Old Perishable Foods Contract between these parties, expired in November, 1958. All of the employers who were parties to that agreement with exception of defendant, negotiated through the Mountain States Employers' Council. When agreement

was reached following these negotiations and the resulting contract, Exhibit "A", was presented to the defendant, defendant informed plaintiff that it had no employees but rather was a company consisting of forty partners. At that time plaintiff struck for approximately six days and during this period defendant executed a "dry freight" agreement with another union. Plaintiff's position was that this agreement was illegal inasmuch as the union was not a local one and no employees of defendant belonged to it. The further agreement (defendant's Exhibit "B") was executed on March 27, 1959, whereby defendant's operations were to be governed by rates in the new "dry freight" agreement (Exhibit "A"). The parties have been in continuous disagreement as to commodities covered by this agreement.

Coming now to the events which preceded the execution of Exhibit 1, it would appear that in June, 1961, Bath, on behalf of plaintiff, delivered several copies of Exhibit 1 to defendant, one of which was finally signed on the last day of the month. As stated above, this required execution of the Western States contract which was then being negotiated; however, defendant refused to sign these when the same were presented.

There is dispute in the evidence as to what occurred in connection with the signing of Exhibit 1. According to plaintiff, Mr. Bath took the memorandum to defendant's place of business some time during the latter part of June, 1961. He testified that he explained to Mr. James Digby and to Mr. W. J. Digby that the old "dry freight" agreement was expiring and that there could possibly be a strike if the multi-union multi-employer negotiations failed to produce a contract. He stated that those companies which did not want to be struck could sign an agreement to be bound by the results of the "dry freight" negotiations. W. J. Digby asked whether, if there was a strike, the defendant would not be involved, and Bath replied that was correct. Digby was also to have then said that if it worked out like it had in 1958, it would be

favorable for the company and that he would consider it and notify Bath. Bath further testified that he did not hear from the company, so on June 30, he placed a telephone call to James Digby at which time he said that the union was contacting the companies which were not participating in the trade association negotiations and that he wondered what position defendant was going to take on the submitted agreement 1. Digby agreed to call him back. Late on June 30, Digby called and said that agreement 1 was executed and delivered to his office. The signed document was received at about 4:50 o'clock that afternoon. Bath denied threatening to strike on any of the occasions of the talks with the Digbys. He admits, however, that he told the company that if the memorandum agreement was not signed it could result in defendant's becoming involved in an industry-wide strike.

Defendant's version of this is somewhat different—he maintains that he signed Exhibit 1 as a result of coercion and duress. He states that Bath threatened to call a strike; that he, Digby, did not have the benefit of the advice of counsel and that he was threatened with a shutdown during a period of heavy perishable food traffic. He admits, however, that when Exhibits 2 and 3 were presented, he refused to sign them notwithstanding that he was then threatened with a strike (according to his testimony).

It is important to observe that the testimony of James Digby, together with the other facts and circumstances, are not persuasive with respect to coercion or duress. First of all, the contention of Digby that he was upset by the swearing of Bath, is impossible to believe. Digby's further testimony that there was effective economic duress applied is also unacceptable. There were remedies available against an unlawful strike; in other words, if plaintiff had attempted a work stoppage notwithstanding a subsisting collective bargaining agreement, the defendant could have applied for and obtained relief at once. It is much more

logical to conclude that defendant signed this contract in the belief that dry freight association negotiations would break down whereby defendant would enjoy extensive dry freight business such as he had experienced on the prior occasion. Furthermore, the history of negotiations between these parties fails to disclose defendant's susceptibility to signing agreements which he did not wish or did not have to sign. Therefore, unless the agreement can be considered insufficient in law due to its vagueness or lack of mutuality, or because of peculiarities of the law applicable to collective bargaining agreements, the defendant's position must fail. We turn, therefore, to a consideration of the applicable law.

■ *First*, it must be recognized that we are dealing here with collective bargaining agreements within the framework of the Labor Management Relations Act, and the action is brought under Title 29 U.S.C. § 185 to enforce such an agreement. Thus, although in the nature of a contract, common law rules concerning contracts are not necessarily applicable. See United Packinghouse Workers v. Maurer-Neuer, Inc., (10 Cir., 1959) 272 F.2d 647, 649:

"Collective bargaining agreements are unique in character and a field unto themselves. They are, of course, binding and enforceable as to all parties to them. Their principal objectives are to effect better working conditions for employees and to achieve industrial peace between employers and employees. * * *"

■ *Secondly*, although the National Labor Relations Act does not specifically provide for bargaining in multi-employer bargaining units, it is apparent that this practice is both expedient, widely prevalent and recognized as valid by the National Labor Relations Board and by the Supreme Court. National Labor Relations Board v. Truck Drivers Local Union No. 449, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957).

■ It is evident, however, that the defendant was not a part of the multi-bargaining unit in previous negotiations but had dealt with the union individually. In most of the cases cited by plaintiff an employer had become previously bound by multi-employer bargaining and had sought to withdraw after having become committed, e. g., McAnary & Welter, Inc., 115 N.L.R.B. 1029 (1956). It is however, possible for an employer to agree to become bound by the contracts negotiated by a multi-employer bargaining unit without becoming a part of the bargaining unit itself. Colonial Cedar Co., 119 N.L.R.B. 1613 (1958).

■ Contrary to the contention of the defendant, Exhibit 1 was not a contract to make a contract because it did not look forward to further negotiations. The agreement was to accept all of the terms and conditions of the agreement as negotiated by the multi-employer-employee bargaining units. Such a contract is not insufficient because of vagueness. See 1 Corbin on Contracts, §§ 29 and 30, and see particularly Shepard v. Carpenter, 54 Minn. 153, 55 N.W. 906; 91 C.J.S. Vendor and Purchaser, § 37, p. 886; Burlew v. Hepps, 6 N.J.Super. 16, 69 A.2d 579; King v. Stanley (Calif., 1948) 32 Cal.2d 584, 197 P.2d 321. Although Exhibit 1 on its face indicates that defendant was not a part of any multi-employer unit, it nevertheless evidences intent of the parties to accept the terms of the Western States Area Freight Agreement:

"IT IS HEREBY AGREED BY AND BETWEEN the undersigned Employer and Local Union 961 that the undersigned Employer shall be bound by all of the terms and provisions of the Western States Area Master Freight Agreement negotiated and any and all supplemental agreements applicable to the Employer's operations effective as of the effective date of said agreements.

"IT IS FURTHER AGREED that the Employer shall execute an agreement containing all of the terms and

conditions of the Western States Area Master Freight Agreement and any and all supplemental agreements thereto applicable to the Employer's operation.

"The Union reserves the right of legal economic action in the event an agreement is not reached by the Associations, Employers and the Unions.

"Dated 6/30/61."

There is, to be sure, some ambiguity as to which Master Freight agreement was intended, but this is easily resolved by resort to extrinsic evidence showing that both parties were aware a new agreement was being negotiated during the summer of 1961 and that this agreement was concluded as Exhibit 2. There is some doubt as to what supplemental agreement may have been "applicable" to defendant's operations but this involves interpretation of the contract with which the court need not be concerned at this time.

▋▋ The argument concerning lack of mutuality is wholly without merit since both parties were bound by the terms of the negotiated contract. Moreover, Exhibit 1 would be enforceable by either party under Section 301, Title 29 U.S.C. § 185. There is no lack of consideration, as there exists as much consideration as supports any labor contract, e. g., the pledge of peaceful employee relations in exchange for acceptable working conditions.

Thus the legal aspect of the allegation that the agreement was signed under duress is the only defense which merits careful scrutiny. As previously pointed out, the defendant testified that he signed the agreement (Exhibit 1) because the plaintiff threatened a strike during a particularly trying period.

▋ A threat of strike under normal circumstances would not constitute duress, since the threat of strike is the accepted weapon or sanction used by employees in the process of collective bargaining. Thus, if the threat of a strike were lawful it would not constitute du-

ress. See Lewis v. Kerns, (S.D.Ind., 1959), 175 F.Supp. 115, 119:

"* * * However, threat of lawful strike does not constitute duress or vitiate a collective bargaining agreement. [Citing cases]

"Assuming, however, that the duress alleged here by the defendants was unlawful, the contracts are not void but only voidable and may be ratified and affirmed by the party upon whom the alleged duress was practiced. [Citing cases] In addition, to render a contract voidable by reason of duress an election to rescind and challenge the validity must be made within a reasonable time. * * * *"

Other cases concerning threat of strikes are: Lewis v. Quality Coal Corporation, (7 Cir., 1959) 270 F.2d 140; Lewis v. Young & Perkins Coal Co., (D. C., W.D., Ky.1960), 190 F.Supp. 838.

The further question is whether the threat of strike in the present circumstances was illegal, and if so, whether it constituted duress. The parties were then bound by a collective bargaining agreement, Exhibit "A", the Perishable Foods Agreement. We can assume that a strike would have violated Exhibit "A"; therefore, had the negotiations concerned the transportation of perishable goods, modification of this contract would have required notice as prescribed in Section 8(d) of the Labor Management Relations Act, Title 29 U.S.C. § 158 (d) (1) and any strike during the sixty day period would have constituted a violation of Section 8(d) (4). A violation of Section 8(d) (4) would give defendant recourse to the National Labor Relations Board to enjoin an "unfair labor practice," Title 29 U.S.C. §§ 107 and 160(e). Furthermore, if the drivers struck leaving perishable goods en route to consumers in the trucks, as defendant indicated he feared, then this would have constituted a breach of the Perishable Foods Agreement (Exhibit "A") and defendant could have sought an injunction in this court under Section 301 in order to prevent any loss of the perishable foods.

Therefore, it is impossible to conclude that there existed duress capable of rendering the contract voidable. Digby had ample opportunity to consider his decision and his excuse that he did not have legal counsel can not be seriously considered. So, assuming that a strike threat was in fact made it could not have been effective and Digby knew, or should have realized it. That he was not moved by this to sign is demonstrated by his subsequent refusal to execute Exhibits 2 and 3. Furthermore, there is ample evidence that Digby signed the contract not because of any threats of strikes, but because he thought the company might profit from an agreement should negotiations break down among the companies and unions involved in the Master Freight Agreement, as the company profited from the transportation of "dry freight" during the industry-wide lockout of 1958. This is the more logical explanation, and is the one which is accepted here.

### Conclusions

Exhibit 5 was effective between the parties from March 1, 1957 until November 1, 1958. Exhibit "A" was effective from March 27, 1959 until April 6, 1962. Exhibit "B" was a supplemental agreement to Exhibit "A" pertaining to "dry freight" operations of defendant and incorporated by reference rates prescribed in Exhibit 4. As Exhibit 4 terminated July 1, 1961 and Exhibit 1 was executed June 30, 1961, as a substitute for Exhibit "B", therefore Exhibit "B" became ineffective as of June 30, 1961. Exhibit 1 expresses an agreement to be bound by Exhibit 2 as "negotiated and any and all supplemental agreements applicable to the Employer's operations." It is, therefore,

Ordered, Adjudged and Decreed that Exhibit 1 is a valid, existing contract between the parties with respect to all of defendant's "dry freight" operations and that Exhibit 1 compels adoption of Exhibit 2 and whatever supplements thereto are applicable to defendant's "dry freight" operations. Exhibit "A" became ineffective on and after April 6, 1962, so that there is no existing contract with respect to defendant's "perishable foods" operations. Exhibit "B" was superseded by Exhibit 1, effective June 30, 1961.