**CENTRAL APPALACHIAN COAL COMPANY et al.**

v.

**UNITED MINE WORKERS OF AMERICA et al.**

Civ. A. No. 73–195–CH.

United States District Court,
S. D. West Virginia.

May 10, 1974.

Forrest H. Roles, Jackson, Kelly, Holt & O'Farrell, Charleston, W. Va., for plaintiffs.

M. E. Boiarsky, Charleston, W. Va., for United Mine Workers of America.

Bruce Boyens, Charleston, W. Va., for Locals.

## MEMORANDUM

MERHIGE, District Judge.

This is essentially a breach of contract action brought pursuant to § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a). The plaintiffs include the Appalachian Power Company (Appalachian Power), the Central Appalachian Coal Company (Central Appalachian), the Southern Appalachian Coal Company (Southern Appalachian) and the Central Coal Company (Central). The defendants include the United Mine Workers of America (UMW), District 17 of the UMW (District 17), and Local Unions Nos. 9051, 9619, 3610, and 9586 of the UMW (hereinafter sometimes collectively "Locals").

The defendants have filed motions directed at the sufficiency of the complaint in various respects. The plaintiffs have responded to those motions, and the matter is now ready for disposition.

The Court would note that the defendant, UMW's motions were filed separately from those of the other defendants, which were filed jointly. However, since both sets of motions are similar in most respects, they will be considered together herein.

### I. The Facts

For the limited purpose of these various motions, the facts before the Court are those stated in the complaint. The allegations of the complaint are essentially as follows:

Plaintiffs, Central Appalachian, Southern Appalachian and Central are corporations engaged in the operation of coal mines producing high quality steam coal. Each operator is the creation and wholly owned subsidiary of the plaintiff Appalachian Power, and pursuant to contracts with Appalachian Power supplies at cost all of its coal to the parent corporation for use in Appalachian Power's electricity generating plants. Plaintiff Appalachian Power is a public utility corporation engaged in the production and distribution of electric power. Defendant UMW is the certified representative for purposes of collective bargaining of the operators' production and maintenance employees. District 17 and the defendant Locals are administrative divisions and agencies of UMW. District 17 also represents all of the operators' production and maintenance employees for purposes of collective bargaining. Local 9051 represents employees of Central Appalachian; Local 9619 represented employees of Central Appalachian at its Lens Creek Mines prior to April 1, 1973, but since that time represents employees of Southern Appalachian, which on that date acquired and began operating the Lens Creek Mines formerly operated by Central Appalachian. Local 3610 represents employees of Southern Appalachian at its Bull Creek Mines. Local 9586 represents employees of Central at its Sporn Mine.

All plaintiffs, with the exception of Appalachian Power, are parties to the National Bituminous Coal Wage Agreement of 1971. (NBCWA of 1971). All plaintiffs, with the exception of Appalachian Power and Southern Appalachian, were parties to the National Bitu-

minous Coal Wage Agreement of 1968. (NBCWA of 1968). Both master agreements had been negotiated on the industry level by the parent international union, UMWA, on behalf of its constituent coal mine workers, who are also members of the various defendant local unions and District 17, of the UMWA.

Both the NBCWA of 1968 and the NBCWA of 1971 contain provisions for the negotiation and arbitration of all local disputes. Neither agreement expressly reserves to employees the right to engage in strikes over disputes arbitrable under those agreements.

The plaintiffs assert that the referenced contracts created in the employees covered and their various local, district and international union organizations, those organizations being the defendants herein, a contractual obligation to refrain from stikes over disputes arbitrable under the contracts. The plaintiffs further assert that the defendant union organizations assumed an affirmative contractual duty to act to prevent such strikes, and to bring them to an immediate halt. Finally, the plaintiffs assert that under both the 1968 and 1971 agreements, the labor organization defendants have the authority and power to enforce, with respect to their members, the contractual obligation to refrain from strikes; and to settle disputes in accordance with the grievance and arbitration procedures of those agreements.

The plaintiffs allege that despite the claimed contractual obligations which they assumed under these contracts, the defendant labor organizations have engaged in, established, and maintained, a pattern and practice of resorting to, and engaging in, strikes in violation of the contracts, and in derogation of the grievance and arbitration provisions set forth therein. Despite their claimed obligation to enforce, and maintain the integrity of, the contracts, and despite the means available to them to that end, the defendant labor organizations have instigated, encouraged, supported, ratified and condoned the pattern and practice of repeated strikes in violation of the contracts.

Appalachian Power created and maintains the several operator plaintiffs, as its subsidiaries, for the purpose of having at all times a dependable, uninterrupted supply of high quality steam coal suitable for use in its electrical power generating plants. Allegedly, in reliance upon the contracts made between its subsidiary operators and promises made by the defendants, not to interrupt work and production by strikes over arbitrable disputes during the life of the contracts, Appalachian Power has planned and arranged its operations and methods of operations, including the expenditure of large sums of money in the construction of coal burning power plants and related facilities, to utilize advantageously the coal production from the mines of its subsidiary operators.

It is further alleged that as a result of the repeated strikes, the plaintiffs have each suffered serious and irreparable injury. The following specifics are referenced. The coal production, operations and plans and schedules of operations of the subsidiary mine operator plaintiffs have been repeatedly halted and disrupted by the strikes. Many thousands of tons of coal production have been lost to them. Their costs of production have been greatly increased. Their ability to secure and protect their property and premises has been impaired, the stability of their work force and their ability to keep and retain key employees has been impaired and placed in jeopardy. They have been denied the uninterrupted production and peaceful labor relations during the life of the contracts which the grievance and arbitration provisions of the contracts purported to assure.

As a result of the repeated strikes, and the consequent interruption of production and disruption of operations of its subsidiary operator plaintiffs, the parent plaintiff, Appalachian Power, has allegedly been denied the dependable and uninterrupted coal supply which it requires, and which the labor contracts

between its subsidiaries and the defendants seemed to assure. Since its intracorporate arrangements with its coal mining subsidiaries require it to pay for the coal at its cost of production, the reduction of coal produced correlatively increases the cost to plaintiff.

Finally, the plaintiffs allege that unless the defendants are restrained and enjoined by this Court from so doing they will continue to engage in, condone, encourage, support and ratify such strikes and work stoppages and said pattern and practice and course of action with respect thereto, at said mines and facilities, and to prevent the operation thereof; and that the defendants will further extend and expand said strikes or work stoppages and their pattern and practice and course of action with respect thereto.

On the foregoing basis, each of the plaintiffs seeks both injunctive and compensatory relief against all of the defendants.

## II. Discussion

### A. Appalachian Power Company's Status as a Party-Plaintiff

All of the defendants have raised a challenge to Appalachian Power's status as a party-plaintiff. These challenges essentially amount to motions, pursuant to Rule 12(b)(6), F.R.Civ.Proc., to dismiss the complaint of Appalachian Power for failure to state a claim.

The defendants point out that jurisdiction is alleged solely on the basis of § 301 of the Labor Management Relations Act (LMRA). They assert that because it is not alleged that Appalachian Power was the signatory to any contract with the defendants, it has failed to raise a claim under § 301.

■ Appalachian Power concedes that it is not, itself, a signatory to any contract with the defendants. It argues, however, that it is sufficient, under § 301 of the LMRA, that the claim raised is based on a collective bargaining contract, whether or not the party raising that claim was, itself, a signatory to the

agreement in question. The Court agrees. See Smith v. Evening News Association, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962).

The question, therefore, becomes whether Appalachian Power has a claim based on the collective bargaining agreement between the defendants and Appalachian Power's subsidiary suppliers, even though Appalachian Power was not, itself, a party to those contracts. The Court concludes that it does.

The Court does not, however, base this conclusion on the theory that Appalachian Power has standing under the contracts as an *intended* third party beneficiary to those contracts. It may be, as plaintiffs contend, that it was the intent of Appalachian Power's various coal producing subsidiaries in negotiating the agreements to assure the parent company a dependable supply of coal. However, there is nothing in the contracts themselves which suggests that there was a mutual understanding between the parties to those contracts that such was the intended result. See 17 Am.Jur.2d, Contracts, §§ 303–307. This is in contrast to the position of union members under a collective bargaining agreement which on its face reflects that the union acts on behalf of its members in negotiating the contract. See Smith v. Evening News Association, *supra.*

Nevertheless, the Court considers that there are two theories of recovery which support Appalachian Power's claims under the agreements in question.

■ First, by virtue of its cost contracts with its subsidiary suppliers, Appalachian Power has been forced to absorb the increased production costs that have allegedly resulted from defendants' claimed contract breaches. To that extent, Appalachian Power should be subrogated to the rights of its subsidiaries under their contracts with the defendants. This is because Appalachian Power, acting under obligation of contract and not voluntarily, has been made to pay an obligation (the increased cost of production) for which the defendants,

because of their alleged contract breach, are claimed to be primarily liable. See 83 C.J.S. Subrogation § 5.

The Court would note, however, that damages under a subrogation theory would not include the price differential to Appalachian Power of obtaining coal from sources other than its subsidiary suppliers. Unlike the increased production costs to its subsidiary suppliers, the higher cost of alternate supplies was not one incurred, in the first instance, by those subsidiaries and merely passed along to Appalachian Power. It may be, however, that depending on the terms of its supply contracts, Appalachian Power would have a claim against its various subsidiaries which, if raised, would give rise to cross-claims by those subsidiaries against the defendants herein. Such claims have not, however, been raised by the pleadings thus far.

■ Alternatively, the Court considers that it may be appropriate under the facts of this case to disregard the corporate separation between Appalachian Power and its various subsidiary suppliers, so as to allow a direct action by the parent against the defendants herein. Of course, it would be incumbent upon Appalachian Power, under this theory, to prove factually that its subsidiaries were "so organized and controlled, and their affairs so conducted, as to make them mere instrumentalities, agencies, conducts or adjuncts" of the parent. 1 Fletcher, Cyclopedia Corporations, § 43. While Appalachian Power has not established this fact thus far in the proceedings, the Court concludes that it is within the scope of the complaint for it to do so at trial. The defendants not having established the contrary to be true, their objection in this regard is premature.

The Court would note that, assuming Appalachian Power can establish facts sufficient to bring it within the "instrumentality rule" for disregarding the corporate separation between itself and its subsidiary suppliers, it may be that damages would include the price differential for alternate supplies. This would depend partially, of course, on whether such damages were reasonably within the contemplation of the parties in entering the collective bargaining contracts in question. See Am.Jur.2d, Damages §§ 55, et seq.

**B. Status of the Local Unions and District 17 Under the Contracts**

■■ District 17 and the various Locals have moved to dismiss as to themselves on the ground that not having been signatories to either the 1968 or 1971 master agreements themselves, they are not obligated thereunder. They argue that plaintiffs have therefore failed to state a claim against them under § 301 of the LMRA, and that jurisdiction is otherwise lacking.

There are numerous cases establishing that local unions, as well as their individual members, may be obligated under the terms of a collective bargaining contract negotiated by a parent national or international union, and may be amenable to suit under § 301 of the LMRA for violations thereof, even though the local unions and their individual members are not formal parties to the agreement. See, e. g., Roadway Express, Inc. v. General Teamsters, etc., Local 249, 330 F.2d 859 (3d Cir. 1964); Sidney Wanzer & Sons, Inc. v. Milk Drivers Union, Local 753, et al., 249 F.Supp. 644 (N.D.Ill. 1966); United States Steel Corp. v. United Mine Workers of America, 320 F. Supp. 743, 746 (W.D.Pa.1970); United States Steel Corp. v. United Mine Workers of America, 77 L.R.R.M. 3134, 3135 (E.D.Ky.1971); Consolidated Coal Co. v. United Mine Workers of America, Local 6869, 362 F.Supp. 1073 (S.D.W.Va.1973). See also, Atkinson v. Sinclair Refining Co., 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed. 2d 462 (1961), implying the same, although the issue was not discussed. This Court agrees with both the reasoning and results of the cases cited, three of which involved the very series of agreements here in question. Furthermore, the Court considers the same principle to apply with respect to regional divisions of the parent union, such as District 17 in this case.

This conclusion does not ignore that for many purposes parent unions and their various regional and local subdivisions enjoy a separate legal status. See UMWA v. Coronado Coal Co., 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975 (1922); Coronado Coal Co. v. UMWA, 268 U.S. 295, 45 S.Ct. 551, 69 L.Ed. 963 (1925). However, the contracts here in question purport to do more than establish the relationships between the various employers and their employees and between the employers and the parent international union. They also have reference to the position of the local and district subdivisions of the parent international in this multi-party relationship. It is at least open to proof that the parent international was acting as agent, in fact, for not only the individual members but also its local and district subdivisions in negotiating the contract.

It is also open to proof that the Locals and District 17 of the parent international have generally acted consistently with the terms of these agreements and have accepted the benefits of provisions having direct reference to them. Assuming this is the case, the natural inference might be that the various Locals and District 17 have adopted the contracts as their own. *Cf.* Roadway Express, Inc. v. Central Teamsters, etc., Local 249, 330 F.2d 859, at 865 (3d Cir. 1964).

Finally, it may be that the plaintiffs would be able to establish an independent agreement by the various Locals and District 17 to be bound by the collective bargaining agreements negotiated by their parent international union. *Cf.* Line Drivers Local No. 961 v. W. J. Digby, Inc., 218 F.Supp. 519 (D.Colo.1963).

### C. Joinder of Parties and Claims

All of the defendants have moved for dismissal as to one or more of the plaintiffs' complaints on grounds which may not be applicable to all of the plaintiffs' complaints. At the same time, different defendants have asserted grounds for dismissal as to all of the claims presented which may not be applicable to all of the defendants. To the extent that dismissal from the action as a whole would be proper as to one or more of the parties, it might be said that such party has been improperly joined.

On the other hand, all of the defendants apparently assert that there has been a misjoinder of both plaintiffs and defendants in strictly the procedural sense. This assertion assumes the viability of all claims raised as between one or more of the plaintiffs and one or more of the defendants. This assertion further assumes that all parties present have an interest in one or more of the claims presented.

As to this latter limited procedural issue, the defendants apparently take the position that the complaint alleges, in reality, several separate and distinct claims all of which do not arise out of a single transaction or series of related transactions. More specifically, the argument seems to be that the complaint fails to allege a sufficient factual relationship between the strike or series of strikes at each of the different coal mines, each of which involved different disputes between different coal mining companies and different Locals of the UMW. They seem to dispute, as conclusory, plaintiffs' allegation that there is a factually related "pattern" of conduct involved. The defendants further contend that joinder of the various parties whose interests relate to these separate transactions or series of transactions is not provided for under Rule 20, F.R.C.P., or elsewhere in the rules. Assuming the defendants are correct, the appropriate Court action would be a severance of the various claims presented, rather than a dismissal of any of those claims, as the defendants have seemingly requested. Rule 21, F.R.Civ.P.

The defendants' position might be strengthened, although not necessarily well taken, were the question limited solely to the joinder of parties under Rule 20. However, Rule 18(a), F.R.Civ. P., provides for the joinder by a party asserting a claim, of *all* claims it may have against an opposing party. The

Court has already expressed its view that the plaintiff, Appalachian Power, has claims derivative from the claims of each of its various subsidiary suppliers against each of the various defendants herein. On the other side of the controversy, the national union, UMW, and District 17, are defendants as to each of the claims raised. Assuming dismissal against the national organization and District 17 is not proper on any other basis, then Appalachian Power has the right, pursuant to Rule 18, to join all of its claims against those two defendants in this one action.

Having thus concluded that the various *claims* have been properly joined, the joinder of *all parties* having an interest in one or more of those claims, as either a party-plaintiff (in the case of the various coal companies) or as a party-defendant (in the case of the various Locals), is permissible under Rule 20. This is precisely what the plaintiffs have done.

### D. Absence of an Explicit No-Strike Provision

■ The collective bargaining agreements here in question are the National Bituminous Coal Wage Agreements of 1968 and 1971, to which the plaintiff coal companies and the defendants are all alleged to have been bound. The plaintiffs' claims are all premised on the theory that the various strikes alleged were all in violation of those agreements. The defendants have all moved, pursuant to Rule 12(b)(6), F.R.Civ.P., to dismiss on the ground that the collective bargaining agreements in question did not contain an explicit no-strike provision, and that none can be implied.

Suffice to say that the defendants' contentions in this regard are clearly precluded by the recent Supreme Court decision in Gateway Coal Co. v. United Mine Workers of America, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583, 42 L.W. 4095 (1974). The Court, in *Gateway*, dealt specifically with the National Bituminous Coal Wage Agreement of 1968. It held that under that contract a no-strike provision was implied with respect to the settlement of local disputes. The Court, in *Gateway*, based its holding on language in the "Settlement of Local and District Disputes" and "Integrity of the Contract" clauses of that agreement, which provided for the settlement of all local disputes through negotiation and arbitration, and on the "presumption of arbitrability" of all labor disputes found in our national labor policy, 42 U.S.L.W. 4098–4099 [94 S.Ct. 629]. The Court does not, thus far, perceive any material change in the 1971 agreement; and the holding in *Gateway*, therefore, appears to be dispositive of the issue with respect to that agreement also.

The disputes in this case were all of a local character, so far as the record presently discloses, and therefore subject to the implied no-strike provisions set forth above.

### E. Union Responsibility for the Strike Activity

Each of the defendants asserts that the various work stoppages alleged were "wildcat" strikes which had not been authorized or ratified by the international, district, or respective local unions, against whom liability is sought. The defendants argue that they cannot, therefore, be held responsible for those strikes.

■ The Court would begin by pointing out that the law does not generally hold a union organization responsible for the unsanctioned acts of its individual members. UMWA v. Coronado Coal Co., 259 U.S. 344, 395, 42 S.Ct. 570, 66 L.Ed. 975 (1922); Coronado Coal Co. v. UMWA, 268 U.S. 295, 304–305, 45 S.Ct. 551, 69 L.Ed. 963 (1925). See also, United Construction Workers v. Haislip Baking Co., 223 F.2d 872, 877 (4th Cir. 1955), cert. den. 350 U.S. 847, 76 S.Ct. 87, 100 L.Ed. 75 (1955); Harnischfeger Corp. v. Sheet Metal Workers, etc., 436 F.2d 351, 355 (6th Cir. 1970). Liability under § 301 of the LMRA does not, however, require union complicity in the form of an express or official authorization or ratification. Rather, it is sufficient that an authorized union agent has acted in a manner tend-

ing to instigate, encourage, condone, or otherwise support the breach activity. See Lewis v. Benedict Coal Corp., 259 F. 2d 346, 351–352 (6th Cir. 1958); United Textile Workers v. Newberry Mills, 238 F.Supp. 366 (W.D.S.C.1965). *Cf.* Schauffler v. Highway Truck Drivers & Helpers, 230 F.2d 7, 10, 12 (3d Cir. 1956). See also, United Construction Workers v. Haislip Baking Co., 223 F.2d 872, 877–879 (4th Cir. 1955).

It is necessary, of course, that the union agent or agents involved have been acting within the scope of their authority and on behalf of each of the union affiliates charged. See United Construction Workers v. Haislip Baking Co., 223 F.2d 872, 879 (4th Cir. 1955). *Cf.* Lewis v. Benedict Coal Corp., 259 F. 2d 346, 352 (6th Cir. 1958); Vulcan Materials Co. v. United Steelworkers of America, 430 F.2d 446 (5th Cir. 1970). It is not, however, necessary that the specific acts of the agent have been approved. 29 U.S.C. § 185(e). See Lewis v. Benedict Coal Co., 259 F.2d 346 (6th Cir. 1958); Vulcan Materials Co. v. United Steelworkers of America, 430 F. 2d 446 (5th Cir. 1970).

The Court would also point out that, contrary to the plaintiffs' suggestion, there does not appear to be any provision in either the 1968 or 1971 master agreements contractually obligating the parent international union or any of its district or local subdivisions to act affirmatively either to prevent unauthorized and illegal strikes or to bring such strikes to an immediate halt. A provision in the National Bituminous Coal Wage Agreement of 1950 obligating the union to use its best efforts to that end has apparently been deleted from all master agreements since that time. In any case, the clause does not appear in either the 1968 or 1971 agreement.

■ Nor does the law otherwise impose a general duty on the part of a union organization to take affirmative action in an effort to prevent or terminate the illegal and unauthorized activities of its various divisional affiliates or individual members. UMWA v. Gibbs, 383 U.S. 715, 739, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); United Construction Workers v. Haislip Baking Co., 223 F.2d 872 (4th Cir. 1955); International Union, UMWA, et al., 117 NLRB 1072 (1957).

■ Nevertheless, the plaintiffs have alleged, in this case, that *each* of the defendant union organizations has actually "instigated, supported, ratified and condoned" the strike activities complained of. The Court disagrees with the defendants' suggestion that these are merely conclusory allegations. They are not legal conclusions as to liability. Rather, they are ultimate facts for which the plaintiffs should be permitted to present evidence at trial. Assuming the plaintiffs would be able to prove these facts, the defendants' liability would be clear.

Moreover, although it is not incumbent on the plaintiffs, at this stage of the proceedings, to disclose the evidentiary facts on which they rely, they have indicated in their brief some of the evidence which they intend to introduce at trial. In short, they have alleged a series of strikes which arguably amount to a pattern of activity at the local and district levels, and which, in turn, may give rise to, or at least support, an inference of union "instigation, support, ratification, or condonation." *Cf.* United States v. International Union, UMWA, 77 F. Supp. 563 (D.D.C.1948), aff'd. 85 U.S. App.D.C. 149, 177 F.2d 29 (1949), cert. den. 338 U.S. 871, 70 S.Ct. 140, 94 L.Ed. 535 (1949); Vulcan Materials Co. v. Steelworkers, 430 F.2d 446 (5th Cir. 1970), cert. den., 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247 (1971); United Textile Workers v. Newberry Mills, 238 F. Supp. 366 (W.D.S.C.1965). There is also a suggestion in the plaintiffs' brief that a similar pattern is alleged to exist at the national level, which, if proved, may likewise be relevant to the question of the parent international's complicity and liability.

■ In addition, the plaintiffs' brief suggests that the defendants have repeatedly enunciated a position that

strikes, such as those here in question, are not forbidden under the master agreement. Depending on the manner in which they have been communicated to the membership and the context in which they were made, such pronouncements themselves may be tantamount to union instigation or condonation of the prohibited activities, even in the absence of official authorization or ratification of each individual strike. *Cf.* Lewis v. Benedict Coal Co., 259 F.2d 346, 351–352 (6th Cir. 1958).

Finally, it may also be that the plaintiffs have still additional, as yet undisclosed, evidence which they should be given the opportunity to bring out at trial.

In conclusion, the Court would simply state that the defendants' present attack, like others dealt with in this memorandum, merely goes to matters of proof and is prematurely raised in a motion to dismiss.

### F. Injunctive Relief

#### 1. Norris-LaGuardia Act

■ Contrary to the defendants' suggestion, the provisions of the Norris-LaGuardia Act, 29 U.S.C. §§ 104, 109, do not act as a bar to injunctive relief under § 301 of the LMRA, 29 U.S.C. § 185(a), and the collective bargaining agreement here in question. See Gateway Coal Co. v. United Mine Workers of America, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583, 42 U.S.L.W. 4095 (1974); Boys Markets, Inc. v. Retail Clerks Union, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed. 2d 199 (1970); Monongahela Power Co. v. Local 2332, IBEW, 484 F.2d 1209 (4th Cir. 1973). First, the plaintiffs have alleged the violation of an implied no-strike provision by the defendants, and the Court finds that the agreements contained such a provision. Second, an order directing the arbitration of local disputes could be made a part of any injunctive decree issued, as the agreement in question specifically provides therefor. Of course, it remains incumbent on the plaintiffs to demonstrate

equitable grounds for the injunctive relief requested. See Boys Markets, Inc. v. Retail Clerks Union, *supra*, at 398 U.S. 254.

#### 2. Equitable Grounds and Mootness

■ The Court has little hesitancy concluding that the work stoppages alleged, if as disruptive of the plaintiffs' coal mining operations as claimed and if reasonably certain to continue into the future, would constitute sufficient grounds for equitable relief. The nature of some of the injuries alleged is such that damages would be speculative at best and compensation may not be reasonably ascertainable therefor.

Moreover, there is a strong public interest in industrial peace, as reflected in our national labor policy. Cf. Boys Markets, Inc. v. Retail Clerks Union, 398 U.S. 235, 251, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). The injury to the public through industrial strife is almost by definition incapable of compensation. In this case there is a potential for specific injury to a segment of the public which may not be capable of adequate compensation. The plaintiffs have alleged that the higher price of coal resulting from the defendants' practices is ultimately reflected in the utility rates to consumers of electricity from the Appalachian Power Company. Even assuming Appalachian Power and all of its subsidiary suppliers would be able, ultimately, to recover their losses resulting from the defendants' alleged contract violations, there is no mechanism available to insure that the recovery could be passed on to Appalachian Power's present consumers on a pro rata basis.

■ Beyond that, however, the defendants assert that there are not presently pending any strikes against the plaintiff coal companies, and that the plaintiffs have failed to allege a continuing controversy with regard to the grievances giving rise to any of the past strikes. The defendants argue, therefore, that the plaintiffs' requests for injunctive relief have been rendered

moot and/or that the plaintiffs have failed to allege sufficient grounds for prospective relief.

Nevertheless, at this stage of the proceedings, it is premature to cut the plaintiffs off from presenting proof of equitable grounds for injunctive relief.

First, the Court considers it within the scope of the pleadings for plaintiffs to prove that some or all of the grievances giving rise to past work stoppages remain unsettled, and that the threat of strikes in the future, arising out of those grievances, remains an imminent threat. *Cf.* CF & I Steel Corp. v. UMW, 372 F. Supp. 846 (D.Colo. Nov. 12, 1973).

Second, the plaintiffs have alleged what is claimed to be an egregious pattern of refusal by the defendants to abide by the arbitration and implied no-strike provisions of their collective bargaining agreements, as local disputes have arisen in the past. Assuming this can be proved, the inference might be that such refusal can be expected to continue in the future, if and when new grievances arise. In addition, it can almost be assumed that local disputes of some nature, though not necessarily the same types of disputes as have developed in the past, will arise in the future. The conclusion would be that a reasonable probability of future illegal strikes exists. A broad injunctive order might be appropriate on that basis alone, rather than to require the plaintiffs to bring a new action as each individual local dispute arises, and as each illegal strike occurs. See Old Ben Coal Corp. v. Local Union No. 1487, UMWA, et al., C.A.No.72–205–D (E.D. Ill. June 8, 1973). See also, Bethlehem Mines Corp. v. UMWA, 340 F.Supp. 829 (W.D.Pa.1972), vacated and remanded 3d Cir., June 19, 1973.

■ It is accurate to conclude, as defendants do, that there is authority for the proposition that our national labor policy dictates a cautious approach to injunctive relief, even under § 301 of the LMRA; and that such relief should *normally* be limited in scope to apply only with respect to present factual disputes.

See, *e. g.*, Old Ben Coal Corp. v. Local Union No. 1487, UMWA, 457 F.2d 162, 165 (7th Cir. 1972); Consolidated Coal Co. v. UMW Local Union No. 6869, 362 F.Supp. 1073, 1082 (S.D.W.Va.1973). However, both cases referenced also observed that broad injunctive relief against future violations of a contractual obligation not to strike would be appropriate in circumstances indicating that the union defendant would be unwilling to abide by an adjudication establishing that certain strikes were unlawful. *Id.* The plaintiffs herein should not be precluded, at this stage of the proceedings, from proving this to be the case, if it be so.

It is conceivable, of course, that the defendants could be expected to alter their past pattern of alleged behavior in light of the recent Supreme Court decision in Gateway Coal Co. v. United Mine Workers of America, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583, 42 U.S. L.W. 4095 (1974), clarifying the law with respect to implied no-strike provisions. However, the Court cannot help but note the defendants' strenuous insistence, even at this late date, that there cannot be implied in their master agreement a no-strike provision.

The Court must also recognize that it has been the law of this Circuit since 1955 that a provision for arbitration as the exclusive means of resolving disputes implies a no-strike agreement. United Construction Workers v. Haislip Baking Co., 223 F.2d 872 (4th Cir. 1955). Contemporaneous decisions in other Circuits have been in accord. See, *e. g.*, Lewis v. Benedict Coal Corp., 259 F.2d 346 (6th Cir. 1958); International Brotherhood of Teamsters v. W. L. Mead, Inc., 230 F.2d 576 (1st Cir. 1956); NLRB v. Dorsey Trailers, Inc., 179 F.2d 589 (5th Cir. 1950); NLRB v. Sunset Minerals, Inc., 211 F.2d 224 (9th Cir. 1954). That general principle was upheld by the Supreme Court in 1962. Teamsters Union v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962). Moreover, prior to several of the strikes here in question, the Court of Appeals for the

Sixth Circuit had specifically held that principle applicable to the 1968 National Bituminous Coal Wage Agreement, which was not materially different from the agreements here in question. See Blue Diamond Coal Co. v. Mine Workers, 436 F.2d 551 (6th Cir. 1970), cert. den., 402 U.S. 930, 91 S.Ct. 1525, 28 L.Ed.2d 863 (1970).

In spite of this overwhelming authority to the contrary, the defendants in this case are alleged to have remained obstinate in their position that the terms of their various agreements do not preclude resort to strikes as a means for resolving local disputes.

Moreover, to the extent that policies emanating from the parent international union may be shown to affect local actions, the experience in the Seventh Circuit is enlightening. The Court of Appeals for that Circuit had first denied the type of broad injunctive relief requested herein, in an action against a defendant local union. Old Ben Coal Mining Co. v. Local Union No. 1487, UMWA, 457 F.2d 162 (7th Cir. 1972). In so doing, the Seventh Circuit Court of Appeals was operating on the assumption that, the governing principles having been enunciated, Union compliance therewith could be expected forthcoming. Nevertheless, subsequent union violations made it necessary for the district court in a later case to grant the broad injunctive relief that had been requested in the earlier case. Old Ben Coal Co. v. Local Union No. 1487, UMWA, et al., C.A.No. 72–205–D (E.D.Ill. June 8, 1973).

In summary, the Court finds no reason for confidence, at this stage of the proceedings, that its determination as to the governing principles will be fully respected in future relations between the parties, absent a specific order mandating future compliance therewith. The Court is, of course, concerned at the prospect of "monitoring" the relations between plaintiffs and defendants in this case for the length of the present contract or some other indefinite period of time. Cf. Island Creek Coal Co. v. Local Union 7970, UMWA, et al., C.A.No.70–243.

However, the Court is also concerned at the prospect of the plaintiffs having to bring a new action as each new dispute arises. The burden on the Court would be equally great in either case.

The Court would solicit the views of the parties at an appropriate later stage in the proceedings—once bad faith has been proven, if at all present—as to alternative remedies that may be available. It may be that punitive damages, although unusual with respect to contractual relationships, would be appropriate, considering the strong public interest in industrial peace, as reflected in our national labor policy. See Sidney Wanzer & Sons, Inc. v. Milk Drivers' Union, Local 753, 249 F.Supp. 664, 668–671 (N.D.Ill. 1966). Cf. Boys' Market, Inc. v. Retail Clerks' Union, 398 U.S. 235, 251, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). But, see United Shoe Workers of America, AFL-CIO v. Brooks Shoe Mfg. Co., 298 F.2d 277 (3d Cir. 1962). The threat of the same in the future, as a general remedy for bad faith violations of the present contract or future contracts, may be a sufficient deterrent to preclude resort to the type of broad injunctive relief requested herein. These matters in any event are not presently in a posture for resolution.

## G. Clean Hands Principle

The defendants' next contention is denominated their "Clean Hands" argument. They point out that the "Integrity of the Contract" clause of both the 1968 and 1971 master agreements provide for the settlement of disputes "through the machinery of this contract and by collective bargaining *without recourse to the courts.*" (Emphasis added). They argue that the present action is precluded as violative of that clause.

More than anything else, this argument serves to point up the potential ambiguity of contracts in general and to reinforce the Court's basic faith in the ability of counsel to make use of such ambiguity to their clients' own best advantage. The defendants would apparently have it both ways. They would

feel free to violate the clause themselves, when it is to their advantage to do so, and then raise that clause as a bar to relief where the plaintiffs would seek court enforcement of its provisions.

The Court would begin by pointing out that the plaintiffs do not seek, in this action, a resolution of the underlying disputes which led to the work stoppages in question. Rather, the plaintiffs seek enforcement of the contract provisions setting up the mechanics for resolving such disputes.

Were the Court to interpret the "Integrity of the Contract" clause as suggested by the defendants, that clause, and the clause providing for the "Settlement of Local Disputes" would be rendered virtually unenforceable and meaningless. These clauses, as recently interpreted by the Supreme Court, provide arbitration as the exclusive remedy for local disputes. Strikes are prohibited thereunder. Gateway Coal Co. v. United Mine Workers of America, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583, 42 U.S.L.W. 4095 (1974). These two clauses were themselves the product of collective bargaining. However, absent court enforcement, and in the face of defendants' alleged refusal to arbitrate, the plaintiffs would be forced, under the defendants' interpretation of the contract, to bargain anew for what they already had—the right to settle local disputes through arbitration and without a strike. The Court simply cannot envision that the parties intended this circular result. The very fact that Gateway Coal Co. v. United Mine Workers of America, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583, 42 U.S.L.W. 4095 (1974), was also an action seeking court enforcement of the provisions here in question necessarily implies that the Supreme Court did not interpret the contract provisions in question as defendants presently suggest.

The Court considers that regardless of the extent to which the contract may limit resort to the courts with respect to substantive issues, the only reasonable interpretation of the contract is that the remedies provisions therein, at least to the extent they provide for the arbitration of local disputes, are subject to court enforcement. Otherwise, the pivotal mechanism which the parties themselves have provided for the settlement of disputes fails, obedience to the terms of the agreement becomes optional, and the entire contractual relationship is in danger of breaking down. Borrowing from the commercial field, ". . . it is the very essence of a sales contract that at least minimum adequate remedies be available." § 2–719, Uniform Commercial Code, Comment 1, Official text, 1962. This is no less true in the field of labor relations.

### H. Motion to Strike

▬ The defendants have moved to strike references, in the complaint, to the 1968 NBCWA. The apparent argument is that the 1971 master agreement being the one that is presently in force, the former agreement is irrelevant with respect to the prospective rights of the parties.

For obvious reasons the Court understands the defendants' motion to have been directed solely at plaintiffs' request for injunctive relief, and not at plaintiffs' request for compensatory relief. The 1968 agreement is, of course, directly relevant to the damage claims relating to strikes that occurred while that agreement was in force.

With respect to the plaintiffs' request for injunctive relief, the defendants can rest assured that the Court is aware that the prospective rights of the parties are governed solely by the terms of the 1971 agreement. Nevertheless, the bargaining history between the parties, including the 1968 agreement, is relevant to the interpretation to be given the 1971 agreement. In addition, an inquiry into the defendants' behavior under the 1968 agreement may be relevant to determining whether the plaintiffs will have been able to establish an "egregious pattern" of past breaches of contract, as alleged in support of their request for injunctive relief.

Accordingly, the defendants' motion to strike is not well taken.

## I. Motion to Dismiss Generally for Failure to State a Claim

The defendants have moved, pursuant to Rule 12(b)(6), F.R.Civ.P., to dismiss for failure, generally, to state a claim against any of the defendants. In view of the more specific grounds raised and discussed previously herein, the Court would view this motion as a "catch all" for any grounds the defendants were fearful of having overlooked. In response, the Court would note that the plaintiffs have alleged a contractual duty by the defendants owed to the plaintiffs, a breach of that duty by the defendants, and resulting damages to the plaintiffs. In addition, the plaintiffs have alleged the threat of future breaches of contract by the defendants resulting in irreparable injury to the plaintiffs. As the contract in question is a collective bargaining agreement, the plaintiffs have clearly alleged a claim under § 301 of the LMRA.

## J. Venue

■ The defendant international union has moved to dismiss on the ground that venue has not been properly laid as to it, allegedly because its principal office is in Washington, D. C. The defendant's argument totally ignores the fact that 29 U.S.C. § 185(c) provides:

(c) For the purposes of actions and proceedings by or against labor organizations in the district courts of the United States, district courts shall be deemed to have jurisdiction of a labor organization (1) in the district in which such organization maintains its principal office, *or (2) in any district in which its duly authorized officers or agents are engaged in representing or acting for employee members.* (emphasis added).

While the provisions of this section have been cast in terms of "jurisdiction" they have consistently been construed as providing a basis for venue. See, *e. g.,* Barefoot v. International Brotherhood of Teamsters, etc., et al., 424 F.2d 1001 (10th Cir. 1970); United Rubber, Cork, Linoleum and Plastic Workers of America, AFL-CIO, Local 102 v. Lee Rubber & Tire Corp., 394 F.2d 362 (3d Cir. 1968); Dixie Carriers, Inc. v. National Maritime Union of America, 35 F.R.D. 365 (S.D. Tex.1964); Kayser Roth Hosiery Co., Inc. v. Textile Workers Union of America, et al., 285 F.Supp. 484 (E.D.Tenn. 1968). This Court agrees with both the reasoning and results of those decisions.

The defendant International has not even attempted to establish that it has no duly authorized officer or agent engaged in representing or acting for employee members in this district. Accordingly, it has failed to carry the burden of establishing that venue in this district is lacking under 29 U.S.C. § 185(c).

Even assuming the provisions of 29 U.S.C. § 185(c) did not relate to venue, the various claims asserted all apparently arose in this district. Accordingly, venue would be proper under the general venue provisions of 28 U.S.C. § 1391(b), absent a more specific provision to the contrary, of which the Court is not aware.

## III. Conclusion

For the reasons heretofore stated, all of the defendants' motions will be denied.

In conclusion the Court would take this opportunity to note that the discussion herein is not indicative of a predisposition on the part of the Court as to any of the proofs that may be elicited at trial. It may be that several of the defendants' substantive objections to this action will find support in the evidence. Indeed what the defendants have seemingly failed to note is the post-trial procedural posture of several of the cases they have relied upon throughout their briefs. It is the defendants' action in raising several of the issues discussed prematurely in a motion to dismiss that has made it necessary for the Court to engage in a time-consuming and laborious discussion of hypothetical situations that may prove to be totally irrelevant to the case as presented at trial.

An appropriate order will issue.